## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE GABELLI ASSET FUND, THE GABELLI DIVIDEND & INCOME TRUST, THE GABELLI VALUE 25 FUND INC., THE GABELLI EQUITY TRUST INC., SM INVESTORS LP and SM INVESTORS II LP, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>SU PING LU, OLIVIER RABILLER, ALESSANDRO GILI, PETER BRACKE, SEAN DEASON, CRAIG BALIS, THIERRY MABRU, RUSSELL JAMES, CARLOS M. CARDOSO, MAURA J. CLARK, COURTNEY M. ENGHAUSER, SUSAN L. MAIN, CARSTEN REINHARDT, and SCOTT A. TOZIER,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION**<br><br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

## <u>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................. 2

II.     JURISDICTION AND VENUE ........................................................................... 7

III.    PARTIES ............................................................................................................. 8

    A.     Plaintiffs .................................................................................................. 8

    B.     Defendants .............................................................................................. 8

    C.     Relevant Non-Parties ........................................................................... 11

IV.     SUBSTANTIVE ALLEGATIONS .................................................................. 12

    A.     The Sham Spin-Off Originated Because Honeywell Faces Billions of
         Dollars in Legacy Asbestos Liability ................................................... 12

    B.     Honeywell Devises a Scheme to Spin-Off Underperforming Assets and Its
         Legacy Asbestos Liabilities ................................................................. 13

    C.     The Spin-Off Negotiations Were a Sham and Unfairly Saddled Garrett
         With Significant Debt and Legacy Liabilities ...................................... 15

    D.     The Public was Told Garrett is an Industry Leader in the OEM and
         Automotive Aftermarket Sectors ......................................................... 21

    E.     Defendants Knew From Inception that the Structure of the Spin-Off Made
         it Virtually Impossible for Garrett to Succeed as an Independent Company ....... 22

    F.     Despite the Known Problems Undermining Garrett, Defendants Issued
         False and Misleading Statements Touting Garrett's Viability in Advance
         of the Spin-Off Closing ........................................................................ 24

    G.     Defendants Continued to Issue False and Misleading Statements
         Following the Spin-Off ......................................................................... 27

    H.     Defendants Secretly Hire Financial Advisors That Concluded Bankruptcy
         Was Likely ............................................................................................ 31

    I.     Garrett Announces Financial Difficulties and Subsequently Files For
         Bankruptcy Protection .......................................................................... 36

V.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
    AND OMISSIONS OF MATERIAL FACTS ................................................. 38

    A.     Defendants' False and Misleading Statements Prior to the October 1, 2018
         Spin-Off ................................................................................................ 38

B.     Defendants' 2018 Class Period False and Misleading Statements ...................... 41

C.     Defendants' 2019 Class Period False and Misleading Statements ...................... 43

D.     Defendants' 2020 Class Period False and Misleading Statements ...................... 47

VI.     DEFENDANTS ACTED WITH SCIENTER WHEN THEY MADE OR CAUSED TO BE MADE MATERIAL MISSTATEMENTS OR OMISSIONS IN VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT ................................... 52

VII.     LOSS CAUSATION ......................................................................................... 54

VIII.     PRESUMPTION OF RELIANCE ...................................................................... 56

IX.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ................................................................... 57

X.     CLASS ACTION ALLEGATIONS ................................................................... 57

XI.     CLAIMS FOR RELIEF ..................................................................................... 58

COUNT I For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants .............................................................................................. 58

COUNT II For Violations of Section 20(a) of the Exchange Act Against All Defendants ........... 60

XII.     PRAYER FOR RELIEF ..................................................................................... 61

XIII.     JURY DEMAND ............................................................................................... 61

Plaintiffs The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc., The Gabelli Equity Trust Inc., SM Investors LP and SM Investors II LP (together, "Plaintiffs") bring this class action (the "Action") for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 against certain of the current and former officers and directors (the "Defendants") of Garrett Motion Inc. ("Garrett") on behalf of themselves and a class (the "Class") defined as:

> **All persons or entities that purchased or otherwise acquired Garrett securities during the period October 1, 2018 through September 18, 2020, inclusive (the "Class Period"), and were damaged thereby.**

Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters.  Plaintiffs' information and belief is based on an investigation conducted by and through Plaintiffs' counsel, which included, among other things, consultation with experts and a review of public filings with the U.S. Securities and Exchange Commission ("SEC"), press releases, investor presentations, earnings calls, analyst research and media reports concerning Garrett and its former parent Honeywell International Inc. ("Honeywell"), public filings in the Garrett bankruptcy proceedings (*In re Garrett Motion Inc.*, No. 20-12212-MEW, United States Bankruptcy Court, Southern District of New York) (the "Bankruptcy Proceedings") and the pending litigation between Garrett and Honeywell (*Garrett Motion Inc. et al. v. Honeywell International Inc. et al.*, Index No. 657106/2019) that was recently removed from the Supreme Court of the State of New York, County of New York, Commercial Division to the United States Bankruptcy Court (Adv. Proc. No. 20-01223 (MEW)).

Counsel's investigation into the facts supporting the claims alleged herein continues, and many of the relevant facts are known only to Defendants, or are exclusively within Defendants' custody or control.  Plaintiffs believe that substantial additional evidentiary support for the

allegations set forth herein will be uncovered after a reasonable opportunity for further investigation and discovery of Defendants.

## I.      INTRODUCTION

1.      On October 1, 2018, multi-national industrial giant Honeywell completed a transaction whereby it "spun" off certain businesses to its shareholders as a new stand-alone company (the "Spin-Off") named Garrett Motion Inc. ("Garrett").  The new Company commenced public trading on the New York Stock Exchange ("NYSE") at $17.60 per share using the ticker symbol "GTX" and immediately generated significant investor interest.  More than 24 million shares traded the first day and the per share price closed up 4.5%.  However, less than two years later, on September 20, 2020, Garrett was forced to seek Chapter 11 bankruptcy protection.

2.      Plaintiffs bring this federal securities class action on behalf of the Class of investors that purchased or otherwise acquired Garrett securities between October 1, 2018 and September 18, 2020 (the trading day before Garrett filed for bankruptcy protection) based on Defendants' false and misleading statements and omissions of material facts concerning the independent Company's viability following the Spin-Off.

3.      The Spin-Off of Garrett was conducted through a sham negotiation process run completely by Honeywell and its conflicted representatives.  Garrett's president and lone-director during the Spin-Off was one of Honeywell's in-house lawyers, Defendant Su Ping Lu, who was installed for the sole purpose of papering over the transaction.   Honeywell also retained the same outside counsel and financial advisors to represent both Honeywell and Garrett in connection with the Spin-Off.  Garrett has subsequently admitted in court that its counsel "***blindly acceded to Honeywell's wishes, regardless of the best interest of their other client, Garrett***" and that its purportedly independent financial advisor was "***hopelessly conflicted.***"

4.      As a result of the exploitive Spin-Off, Honeywell forced Garrett to issue approximately $1.6 billion of new third-party indebtedness to fund an approximately $1.6 billion cash distribution to Honeywell.  Honeywell also caused a subsidiary of the Company (Garrett ASASCO Inc., or "ASASCO") to enter into a financially extraordinary indemnity agreement (the "Indemnity Agreement"), with a term of 30 years and **_maximum payments up to $5.25 billion_**, to reimburse Honeywell for legacy asbestos exposure arising out of an unrelated Honeywell business. While this debt and indemnity structure was generally disclosed to investors in connection with the Spin-Off, Garrett and Honeywell did not disclose the Spin-Off was the result of a sham process and facilitated by a one-sided negotiation, nor did it disclose that the debt structure and indemnity obligations made it **_virtually impossible for Garrett to remain competitive as an independent company_**.

5.      Unbeknownst to investors, Garrett's senior executives and directors knew since the time of the Spin-Off that the debt structure, Indemnity Agreement and related obstacles would make it nearly impossible for Garrett to operate its business and would likely force Garrett into bankruptcy within the next couple of years.

6.      In fact, Garrett revealed for the first time in August 2020 that it retained financial advisors in the fourth quarter of 2019 (just one year after the Spin-Off) and that those advisors had concluded that **_no financial or strategic transactions would be available to Garrett without restructuring_** the debt/indemnity obligations through bankruptcy and/or litigation.

7.      Incredibly, Garrett's first day bankruptcy filings admit that Garrett and its senior officers and directors knew since the time of the Spin-Off that the capital structure and Indemnity Agreement would make it nearly impossible for the Company to succeed for at least the following reasons:

- *First*, Garrett's business model and industry position requires constant investment in new technology, both to improve the Company's existing products and to develop new products to meet customer demands. Because Garrett's balance sheet was heavily burdened by debt and the Indemnity Agreement since the Spin-Off, Defendants knew Garrett's ability to make investments in technology to preserve its business for the future would be severely constrained. Moreover, because of its balance sheet and high leverage, Garrett has no access to incremental debt to fund R&D or capital expenditures;

- *Second*, Defendants knew that Garrett's precarious balance sheet created by the Spin-Off would make it difficult for Garrett to maintain its business and financial relationships with OEMs and suppliers. Because the Company is substantially overleveraged compared to all of its primary competitors (even before considering the effects of the Indemnity Agreement), Defendants were aware that OEMs and suppliers had growing concerns about its viability and its growing technological disadvantages;

- *Third*, Defendants knew Garrett's leverage and indemnity obligations would make it nearly impossible for the Company to navigate the highly uncertain and rapidly shifting automotive industry. In recent years, the automotive industry has been highly uncertain due to technological changes and unprecedented disruptions, which has led to increased competition from new participants. When these factors are considered in light of declining car sales in the overall automotive market, it is clear that the automotive industry is ripe for consolidation among industry participants. Defendants knew since the time of the Spin-Off that the Company's ability to participate in such consolidation and compete on a going-forward basis would effectively be precluded by its capital structure; and

- *Fourth*, Defendants knew Garrett would not have access to the equity capital necessary to grow as an independent company and that no lender or investor would contribute new equity capital subordinate to both the Company's funded debt and its indemnity obligations.

8.     Garrett and its senior officers and directors misled investors about these realities since at least the closing of the October 1, 2018 Spin-Off. While Garrett's SEC filings contained certain generalized risk factors that warned the debt and indemnity obligations **"may"** negatively impact the Company, at no time did Defendants disclose what they **now admit they knew**—that each of the supposed risks had **actually manifested from the time of the Spin-Off, that the above issues were in fact known to already be preventing Garrett from remaining competitive, and that**

***Defendants knew from the time of the Spin-off that Garrett was not viable as an independent company***.

9.      To make matters worse, Defendants issued numerous countervailing statements directly contradicting what they now admit they knew.  For example, in an earnings release in February 2020, Defendant Olivier Rabiller, Garrett's President and CEO, told investors that "[*w*]*ith significant financial flexibility* combined with the industry's broadest portfolio for LV, commercial vehicle, hybrid, and fuel cell products, *we are well positioned to build upon the progress we achieved during our first full year as an independent company*."  Not only does this statement (and many others like it) directly contradict the fact Defendants now admit they knew from October 2018 that Garrett was not viable as an independent company, it flies in the face of the fact Garrett now admits it had retained professionals to evaluate its strategic options – including bankruptcy months before during the fourth quarter of 2019.

10.      But Defendants could only hide the fact that it was impossible to navigate Garrett's capital structure issues for so long.  The truth was partially disclosed on August 26, 2020 before the market opened, when Garrett issued a press release stating that its "leveraged capital structure poses significant challenges to its overall strategic and financial flexibility and may impair its ability to gain or hold market share in the highly competitive automotive supply market, thereby putting Garrett at a meaningful disadvantage relative to its peers."  Garrett further stated that its "high leverage is exacerbated by significant claims asserted by Honeywell against certain Garrett subsidiaries under the disputed subordinated asbestos indemnity and the tax matters agreement."  Following this news, Garrett's stock price fell $3.04 per share, or 44%, to close at $3.84 per share.

11.      Additional truth was partially revealed on September 18, 2020, when *The Wall Street Journal* reported that "Auto Supplier Garrett Motion Nears Bankruptcy Sale to KPS."  *The*

*Wall Street Journal* detailed, among other things, that Garrett's bankruptcy filing was imminent due to its unsustainable capital structure. On this news, Garrett's stock price fell an additional 16%, from $2.41 per share on September 17, 2020 to $2.01 per share on September 18, 2020.

12.     The full truth was revealed on September 20, 2020 when Garrett filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York (the "Garrett Bankruptcy"). In connection with the announcement, Garrett CEO Olivier Rabiller stated that "[a]lthough the fundamentals of our business are strong and we have continued to try to develop our business strategy, *the financial strains of the heavy debt load and liabilities we inherited in the spinoff from Honeywell – all exacerbated by COVID-19 – have created a significant long-term burden on our business*." Following this announcement, Garrett's shares ceased trading under the symbol GTX and began trading under the symbol GTXMQ. Shares closed at $1.76 per share on September 22, 2020. In all Garrett shares lost approximately $7.21 in value as a direct result of the fraud—a market cap loss of

13.     During the first day of the Bankruptcy Proceedings, Garrett's counsel admitted that Garrett had been looking at strategic alternatives for more than a year because of the capital structure imposed on it during the Spin-Off, stating: "Garrett Motion has a good business and a very bad capital structure. *The capital structure is inherited from a 2018 spinoff. It hinders Garrett's ability to compete in its industry and it creates existential risks for the business* in the future, given the potentially fatal combination of excessive leverage and global reach. Garrett commenced these [bankruptcy] cases *after a year-long strategic review process* and a liquidity scare during the first wave of the COVID pandemic."

14.     Plaintiffs bring this action on behalf of themselves and other similarly situated Class members to recover damages for their investments in Garrett since the Spin-Off while

6

Defendants knew but did not disclose that the Company was not viable and was headed for bankruptcy.

## II.      JURISDICTION AND VENUE

15.      This Court has jurisdiction over this Action under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

16.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this District.  Moreover, Garrett has voluntarily elected to file for bankruptcy protection in this District and in those filings has asserted jurisdiction based on certain bank accounts of its subsidiaries.

17.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District to render the exercise of jurisdiction over the Defendant by this Court permissible under traditional notions of fair play and substantial justice.  Each Defendant was a Garrett senior officer or director during the Class Period.

18.      In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mail, interstate telephone communications and the facilities of a national securities exchange.

### III.    PARTIES

#### A.    Plaintiffs

19.    Plaintiff The Gabelli Asset Fund is a mutual fund managed by Gabelli Funds, LLC, and has its principal place of business in Rye, New York.  Gabelli suffered substantial losses as a result of its investments in Garrett common stock during the Class Period.

20.    Plaintiff The Gabelli Dividend & Income Trust Fund is a mutual fund managed by Gabelli Funds, LLC, and has its principal place of business in Rye, New York.  Gabelli suffered substantial losses as a result of its investments in Garrett common stock during the Class Period.

21.    Plaintiff The Gabelli Value 25 Fund Inc. is a mutual fund managed by Gabelli Funds, LLC, and has its principal place of business in Rye, New York.  Gabelli suffered substantial losses as a result of its investments in Garrett common stock during the Class Period.

22.    Plaintiff The Gabelli Equity Trust Inc. is a mutual fund managed by Gabelli Funds, LLC, and has its principal place of business in Rye, New York.  Gabelli suffered substantial losses as a result of its investments in Garrett common stock during the Class Period.

23.    Plaintiff SM Investors LP is an investment fund managed by S Muoio & Co. LLC, and has its principal place of business in New York, New York.  SM Investors LP suffered substantial losses as a result of its investments in Garrett common stock during the Class Period.

24.    Plaintiff SM Investors II LP is an investment fund managed by S Muoio & Co. LLC, and has its principal place of business in New York, New York.  SM Investors II LP suffered substantial losses as a result of its investments in Garrett common stock during the Class Period.

#### B.    Defendants

25.    Defendant Su Ping Lu was a member of Honeywell's General Counsel's office. Defendant Lu was installed by Honeywell as President and as the sole member of the Garrett Board of Directors in order to paper over various aspects of the Spin-Off, all of which worked to

Honeywell's benefit and to the detriment of Garrett shareholders. Lu also signed the Spin Registration Statement on or about August 23, 2018. Lu acted in the dual (and deeply conflicted) roles of an assistant general counsel for Honeywell and as President and Director of Garrett throughout the pre-Spin process until September 30, 2018 – the day before the Spin-Off.

26. Defendant Olivier Rabiller was Garrett's President and Chief Executive Officer at all relevant times following the Spin-Off. On June 15, 2018, Honeywell announced Defendant Rabiller would become Garrett's CEO following the Spin-Off. Defendant Rabiller officially assumed the position of CEO and became a member of the Garrett Board effective October 1, 2018 – the date of the Spin-Off. Before joining Garrett, Rabiller served as President and CEO of the Transportation Systems division at Honeywell, and before that as Vice President and General Manager of Transportation Systems for Honeywell's High Growth Regions, Business Development and Aftermarket. Defendant Rabiller signed documents alleged to be false and misleading dated October 1, 2018, November 7, 2018, March 1, 2019, May 7, 2019, July 30, 2019, November 8, 2019, February 27, 2019, May 11, 2019 and July 30, 2019 and participated in various Garrett investor calls/presentations including those on September 6, 2018, November 7, 2018, February 20, 2019, May 7, 2019 July 30, 2019, November 8, 2019, February 27, 2020, May 11, 2020 and July 30, 2020.

27. Defendant Allesandro Gili was Garrett's Chief Financial Officer from October 1, 2018 to September 2, 2019. Defendant Gili signed documents alleged to be false and misleading dated November 7, 2018, March 1, 2019, May 7, 2019 and July 30, 2019, and participated in various Garrett investor calls/presentations including those on September 6, 2018, November 7, 2018, February 20, 2019, May 7, 2019 and July 30, 2019.

28.     Defendant Peter Bracke was Garrett's Interim CFO from September 2019 to June 2020.  Since June 2020, Bracke has served as Garrett's Vice President and Chief Transformation Officer.  Prior to the Spin-Off, Bracke held various senior-level roles within multiple divisions at Honeywell during his more than 20-year tenure at the company.  Defendant Bracke signed documents alleged to be false and misleading dated November 8, 2019, February 27, 2020, and May 11, 2020 and participated in various Garrett investor calls/presentations on those same dates.

29.     Defendant Sean Deason has been Garrett's CFO since June 2020.  Defendant Deason signed Garrett's Form 10-Q including false and misleading statements dated May 11, 2020 and participated in Garrett's earnings call on the same date.

30.     Defendant Craig Balis has been Garrett's Chief Technology Officer since the Spin-Off.  Prior to the Spin-Off, Balis was the Vice President and Chief Technology Officer of Honeywell Transportation Systems.  Defendant Balis participated in Garrett's investor presentation on September 6, 2018.

31.     Defendant Thierry Mabru has been Garrett's SVP Integrated Supply Chain since the Spin-Off.  Prior to the Spin-Off, Defendant Mabru held senior roles at Honeywell since 2006, and most recently worked as the Vice President of Global Integrated Supply Chain.  Defendant Mabru participated in Garrett's investor presentation on September 6, 2018.

32.     Defendant Russell James has served as Garrett's Chief Accounting Officer and Controller since the Spin-Off.  Defendant James signed documents alleged to be false and misleading dated March 1, 2019 and February 27, 2020.

33.     Defendant Carlos M. Cardoso has served as Garrett's non-executive chairperson of the Board since the Spin-Off.  Defendant Cardoso signed documents alleged to be false and misleading dated March 1, 2019 and February 27, 2020.

34.     Defendant Maura J. Clark has served as a member of the Garrett Board since the Spin-Off.  Defendant Clark signed documents alleged to be false and misleading dated March 1, 2019 and February 27, 2020.

35.     Defendant Courtney M.  Enghauser has served as a member of the Garrett Board since the Spin-Off.  Defendant Enghauser signed documents alleged to be false and misleading dated March 1, 2019 and February 27, 2020.

36.     Defendant Susan L. Main has served as a member of the Garrett Board since the Spin-Off.  Defendant Main signed documents alleged to be false and misleading dated March 1, 2019 and February 27, 2020.

37.     Defendant Carsten J. Reinhardt has served as a member of the Garrett Board since the Spin-Off.  Defendant Reinhardt signed documents alleged to be false and misleading dated March 1, 2019 and February 27, 2020.

38.     Defendant Scott A. Tozier has served as a member of the Garrett Board since the Spin-Off.   Defendant Tozier signed documents alleged to be false and misleading dated March 1, 2019 and February 27, 2020.

39.     Each of the above-referenced defendants are named in both Count I and Count II and are collectively referred to herein as "Defendants."

**C.     Relevant Non-Parties**

40.     Garrett Motion is a Delaware Corporation with its principal executive offices located in Switzerland.  During the Class Period, Garrett's common stock traded on the New York Stock Exchange under the symbol "GTX," and now (post-bankruptcy filing) trades under the symbol "GTXMQ."  Garrett designs, manufactures and sells turbochargers, electric-boosting and connected vehicle technologies for original equipment manufacturers and the aftermarket.  Garrett

filed for Chapter 11 bankruptcy protection on September 20, 2020, asserting jurisdiction based on, among other things, bank accounts of its subsidiaries in New York.

41.     Honeywell International Inc. is a Delaware corporation with its principal executive offices at 300 South Tryon Street, Charlotte, North Carolina.   Honeywell is one of the largest industrial companies in the world, with more than 113,000 employees spread across 932 global locations and annual revenue exceeding $36 billion.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     The Sham Spin-Off Originated Because Honeywell Faces Billions of Dollars in Legacy Asbestos Liability

42.     The Bendix Corporation ("Bendix") began manufacturing products with asbestos in 1939.   Until at least 1983, more than 15 years after Bendix was on notice of the dangers of asbestos and 12 years after the United States Environmental Protection Agency ("EPA") formally classified the mineral as a human carcinogen, Bendix manufactured brakes using twenty-five to fifty percent asbestos.   Plaintiffs in lawsuits across the country have claimed Bendix/Allied Corporation/AlliedSignal did not completely cease using asbestos until 2001.

43.     On April 1, 1985, Bendix was merged into Allied Corporation, which was subsequently merged into AlliedSignal Inc.   On December 4, 1999, AlliedSignal Inc. merged with Honeywell Inc. and Honeywell Inc. ceased to exist as a legal entity.   On that same day, AlliedSignal Inc. changed its name to Honeywell International Inc. (the combined company took Honeywell's name in order to avoid being associated with asbestos, despite AlliedSignal having nearly twice Honeywell's annual revenues).

44.     Honeywell has faced enormous liabilities as a result of Bendix asbestos-related products and operations.   In its 2004 annual report, Honeywell estimated it resolved 71,000 Bendix-related asbestos claims from 1981 through 2004.   By 2012, Honeywell estimated it

continued to have 23,141 unresolved claims pending against it.  Honeywell disclosed through a Form 8-K filed on August 23, 218 that, as a result of an SEC enforcement action, Honeywell would restate its Bendix-related asbestos claims liability from $616 million to $1.7 billion as of December 31, 2017 to account for projected costs through 2059.

### B.    Honeywell Devises a Scheme to Spin-Off Underperforming Assets and Its Legacy Asbestos Liabilities

45.    From 2002 to 2015, under then-CEO Dave Cote, Honeywell engaged in a growth-by-acquisition strategy, completing more than 100 deals between 2002 and 2015, resulting in an increase of over $12 billion in annual sales revenue.  In the wake of the failed acquisition of United Technologies Corp. ("UTC") in 2016, Cote began exploring alternatives to bolster Honeywell's revenues and create cost-cutting opportunities to boost Honeywell's valuation.  Cote devised a strategy to boost Honeywell's valuation by disposing of underperforming assets through spin-offs and divestitures.

46.    To facilitate the implementation of his plan to trim Honeywell's business units and eliminate money-losing assets, on April 4, 2016, Honeywell elevated Cote's hand-picked successor Darius Adamcyzk (formerly the head of the performance materials business) to the newly-created role of President and Chief Operating Officer.  Adamczyk led Honeywell's detailed review of its entire business portfolio for the purpose of identifying potential strategic transactions to improve Honeywell's balance sheet.  Adamczyk succeeded Cote as Honeywell's CEO on March 31, 2017.

47.    Just a month later, on April 27, 2017, Third Point LLC ("Third Point"), the activist hedge fund headed by Daniel S. Loeb, published its First Quarter 2017 investor letter disclosing Third Point had acquired a large stake in Honeywell and was advocating for a breakup of Honeywell to enhance shareholder value.  Third Point argued in its letter that a spin-off transaction

of the Aerospace division would "transform Honeywell into an industrial growth company" and specifically highlighted Honeywell's lack of premium valuation relative to its peer group, stating: "[t]his peer group currently trades at an average forward P/E multiple of 23x, a nearly 30% premium to Honeywell's forward P/E multiple of 18x. A more focused Honeywell should match or exceed the multiples of its peer group, especially if management delivers on its commitment to return to free cash flow conversion in excess of 100% by 2018."

48.     Honeywell resisted Third Point's call to spin-off the Aerospace business.  In an Aerospace investor showcase held in May 2017, Honeywell emphasized it had "invested over $18 billion in aerospace" since 2010 – investments that would be lost to Honeywell shareholders if it spun off the aerospace unit before having a chance to profit from those investments.

49.     However, Adamczyk was feeling the pressure.  During a presentation at the Electrical Products Group conference on May 23, 2017, Adamczyk stated that: "I am aligned with Third Point . . . we do have an opportunity to simplify our portfolio.  How we do that, well, we're still assessing that."  Adamczyk stated that in response to Third Point's advances, Honeywell would decide by Fall of 2017 whether to "do nothing," pursue a spin-off of the Aerospace division or "something different."

50.     In response, through a series of meetings with Third Point, Adamczyk indicated he wanted to keep the aerospace business, but instead proposed the spin-off of Honeywell's homes and transportation business segments in to two separate publicly traded companies (that would become Resideo and Garrett).

51.     On October 10, 2017, Honeywell announced its intention to Spin-Off its:  (1) Transportation Systems business—a manufacturer of turbochargers for vehicles (Garrett Motion); and (2) Homes and Global Distribution, that Honeywell claimed was a "Leading Provider to

Global Home HVAC Controls and Security Markets Plus Leading Global Fire and Security Distributor (ADI)" (a basket of previously unrelated underperforming businesses and product lines that would later be cobbled together to become Resideo).

52.     Both of the spin-offs were the brainchild of Adamczyk, and his "first major move" in the position as Honeywell's CEO.  Adamczyk sought to use the spin-offs to convince the market that Honeywell's myriad legacy liabilities, that had saddled the company for decades and served as a major barrier to earning a premium valuation, would no longer impact Honeywell's balance sheet and future earnings.  Adamcyzk also viewed the spin-offs as a means to blunt the activist threat posed by Third Point.  In this regard, at the time the spins were announced, Adamczyk stated that the Spin-Offs would allow the businesses to be "better positioned to maximize shareowner value through focused strategic decision making and capital allocation tailored to their end markets."

C.     **The Spin-Off Negotiations Were a Sham and Unfairly Saddled Garrett With Significant Debt and Legacy Liabilities**

53.      From the outset of the transaction, Honeywell exercised complete control over the terms of the Spin-Off without regard to the impact on Garrett.  Honeywell appointed its own in-house counsel – Defendant Su Ping Lu – as Garrett's President to paper the Spin-Off with Honeywell.  Garrett did not have independent director representation and was even represented by the same law firm and financial advisor that represented Honeywell during the process.

54.     Defendant Lu, a Honeywell in-house attorney, was deeply conflicted and was quite literally on both sides of the Spin-Off transaction.  Defendant Lu was the President and sole director of several of the Garrett entities in September 2018 when the Spin-Off documents and key debt and indemnification agreements were being implemented.  At the same time as negotiating critical Spin-Off agreements on behalf of Garrett, Defendant Lu simultaneously served as a

director or in an executive capacity on behalf of Honeywell and several Honeywell-affiliated entities, including as Assistant General Counsel and Assistant Corporate Secretary for Honeywell International itself.

55.     In addition to Defendant Lu, the outside firms "advising" Garrett also stood on both sides of the Spin-Off transaction.  For instance, the law firm Paul, Weiss, Rifkind, Wharton & Garrison ("Paul Weiss") represented Honeywell before and during the Spin-Off, while at the same time representing Garrett in the negotiation and execution of the Spin-Off documents.  Confirming the conflict, Paul Weiss is listed as "Notice Counsel" for both parties on several key Spin-Off agreements, and indisputably represented both entities in connection with the Separation and Distribution Agreement that governed critical aspects of the Spin-Off.  Garrett has argued in its pending litigation against Honeywell that Paul Weiss "blindly acceded to Honeywell's wishes, regardless of the best interest of their other client, Garrett."

56.     Garrett's supposedly "independent" financial advisor in connection with the Spin-Off – Duff & Phelps, LLC ("Duff & Phelps") – was also allegedly conflicted.  Duff & Phelps purportedly acted, simultaneously, as the independent financial advisor to both Garrett and Honeywell for the Spin-Off.  Garrett has alleged in court filings that Duff & Phelps was "hopelessly conflicted" during the Spin-Off negotiation process.

57.     Garrett did not disclose these conflicts in advance of the Spin-Off.  Instead, Garrett's Form 10 filed in August 2018 merely stated as a risk that "we *may* have potential business conflicts of interest with Honeywell with respect to our past and ongoing relationships" and that "[f]ollowing the Spin-Off, certain of our directors and employees *may* have actual or potential conflicts of interest because of their financial interests in Honeywell."  The Form 10 elaborated that "Because of their current of former positions with Honeywell, certain of our expected

executive officers and directors own equity interests in Honeywell.  Continuing ownership of Honeywell shares and equity awards could create, or appear to create, potential conflicts of interest if SpinCo and Honeywell face decisions that could have implications for both SpinCo and Honeywell."  Clearly, these risk factors did *not* adequately state that Garrett's only representative negotiating key Spin-Off agreements was simultaneously employed as an associate general counsel at Honeywell.

58.    In addition to installing a hopelessly conflicted signatory and advisors at Garrett, in a further effort to avoid oversight Honeywell deliberately structured the spin of Garrett to meet the requirements for exemption from formal registration and the attendant filing of an S-1 under the Securities Act.  Instead, Honeywell registered Garrett's common stock under the less-onerous Section 12(g) of the Exchange Act requiring the filing of a Form 10.  Honeywell likewise spun Garrett without conducting an initial public offering of common stock (Honeywell employed these same tactics in connection with the spin-off of Resideo).

59.    These conflicts and structural inequalities allowed Honeywell to implement the sham Spin-Off that imposed significant debt and indemnification liabilities on Garrett.  Garrett has conceded in subsequent court filings that it "had no choice in entering into" many of the key Spin-Off agreements, such as the Indemnification Agreement, and currently concedes in a lawsuit against Honeywell that certain agreements were "forced upon Garrett as part of a carefully orchestrated scheme to try to create the appearance of propriety."

60.    Significantly, Honeywell deliberately chose to spin Garrett (and Resideo) rather than sell the enterprise because no buyer would voluntarily purchase underperforming assets and assume potentially billions of dollars in legacy liabilities, including the Bendix-related asbestos

liabilities.  Indeed, the stalking horse bidder in the Garrett Bankruptcy has offered to buy only the Company's assets for $2.1 billion to avoid the liabilities to Honeywell.

61.     Honeywell knew it would be unable to sell the transportation business that became Garrett because its prior attempt had failed in dramatic fashion.  Specifically, in 2003 Honeywell attempted to offload Bendix-related asbestos liabilities by "selling" Honeywell's Friction Materials and Bendix business to bankrupt Federal-Mogul Corporation in exchange for a permanent channeling injunction requiring all asbestos-related claims to be submitted to a Bendix trust established by Federal-Mogul.  General Motors, Ford and Daimler Chrysler successfully sued to block the Honeywell/Federal-Mogul transaction as a fraudulent transfer.  When Honeywell eventually did sell the Friction Materials business in 2014 to Federal Mogul, Honeywell was forced to retain Bendix-related asbestos liabilities.

62.     Through the sham Spin-Off negotiations, on September 12, 2018, Garrett was forced to agree to the Indemnity Agreement because Honeywell had installed its hopelessly conflicted assistant general counsel as Garrett's President and die rector for just that purpose.  The agreement is between and among Garrett-subsidiary Garrett ASASCO Inc. ("ASACO"), Honeywell ASACO Inc., Honeywell ASASCO 2 Inc. and Honeywell International Inc.  The Indemnity Agreement requires, among other things, that ASASCO make payments to Honeywell to reimburse it for 90% of Honeywell's legacy Bendix business in the United States.  The agreement also requires ASASCO to make certain payments for other environmental-related liabilities and non-United States asbestos-related liabilities.  Specifically, ASASCO is contractually obligated to indemnify Honeywell for 90% of the covered liabilities, including judgments, settlements and the legal costs of defense up to an annual cap of $175 million.  The ASASCO Indemnity Agreement continues for thirty years after the Spin-Off (i.e. until December

31, 2048), unless there are three consecutive years during which the amounts owed to Honeywell under the agreement are less than the Euro-equivalent of $25 million.

63.     In addition to the payment obligations, the ASASCO Indemnity Agreement imposes on ASASCO and Garrett numerous "loan-like covenants and restrictions," including limitations restricting the ability of Garrett to merge into or acquire other companies.

64.     Though previously unknown to investors, Garrett's first day bankruptcy filings admit that many aspects of the Indemnity Agreement created major impediments to Garrett's ability to operate as an independent company from inception.  These admissions now make clear that Garrett and its senior executives knew of these issues since the time of the Spin-Off and were aware these issues would undermine the viability of the post-spin off company.  Among other things:  (i) ASASCO/Garrett have no involvement in the asbestos liability claims or settlement process and no ability to control costs; (ii) the indemnity obligations cannot be prepaid or restructured; (iii) the covenants essentially provide Honeywell with an absolute veto over any Garrett transaction outside of the ordinary course of business; and (iv) the indemnity obligation cannot be terminated or cashed out in connection with a merger or strategic transaction, but must be assumed by any purchaser or surviving company.

65.     On December 2, 2019, Garrett sued Honeywell in the New York Supreme Court to, among other things, establish that the financial obligation and the affirmative and negative covenants under the Indemnity Agreement are not enforceable.  That litigation has been removed to federal court as a result of the bankruptcy.  Garrett has argued in its lawsuit against Honeywell that the Indemnification Agreement is particularly unfair because Garrett does not and has not made automotive brake linings containing asbestos nor any other asbestos-containing products.  In

addition, Garrett has not been named as a defendant in any Bendix-related litigation in the United States.

66.     In its court filings Garrett also points out that the Indemnification Agreement was, incredibly, signed by Defendant Lu (who was then President of Garrett) on behalf of both Garrett and *Honeywell*.  At the same time the hopelessly conflicted Lu, as the sole member of the Garrett Board of Directors, purportedly found that entering into the agreement was "advisable and in the best interests of the Company and its sole stockholder."  However, Lu had no basis to make such a conclusion and both Honeywell and Garrett used Duff and Phelps as their financial advisor, and both were represented by Paul Weiss in connection with the Indemnification Agreement.

67.     In addition to the indemnification liabilities, Honeywell's hopelessly conflicted and self-interested Spin-Off "negotiations" forced Garrett to assume significant debt ***in order to fund an approximate \$1.6 billion cash distribution to Honeywell***.  In this regard, Honeywell and Lu forced Garrett and related affiliates into a Credit Agreement dated September 27, 2018 for approximately \$1.45 billion, consisting of (i) a seven-year senior secured first-lien term loan B loan facility,  (ii) a five-year senior secured first-lien term loan A facility in an aggregate principal amount of approximately €251.6 million, and (iii) a five-year senior secured first-lien revolving credit facility in an aggregate commitment amount of €430 million, with revolving loans to the Swiss Borrower to be made available in a number of currencies.  The term A facility matures on September 26, 2023 and the term B facility matures on September 27, 2025, and all of the loans bear interest at fluctuating rates.

68.     As of September 20, 2020, the date of Garrett's bankruptcy filing, the outstanding principal amount under the revolving credit facility was \$370 million and the outstanding principal amount under the term loan facilities was approximately \$1,077 million.

69.     In addition to the credit facility and term loan facilities, during the Spin-Off negotiations Honeywell forced Garrett affiliates to issue €350 million in senior notes pursuant to an Indenture dated September 27, 2018.  These senior notes bear interest at 5.125% annually and mature on October 15, 2026.

70.     Along with the indemnification and debt obligations, Honeywell and Lu forced Garrett into to a Tax Matters Agreement dated September 12, 2019, requiring Garrett to reimburse Honeywell for certain taxes that Honeywell determines are attributable to Garrett.  These tax obligations include certain income taxes, sales taxes, VAT and payroll taxes and additional obligations under the Tax cuts and Jobs Act of 2017.  As of September 2020, Honeywell determined that Garrett's payment obligations total $240 million, to be paid in eight annual installments from November 2018 through April 2025.

**D.     The Public was Told Garrett is an Industry Leader in the OEM and Automotive Aftermarket Sectors**

71.     To facilitate the Spin-Off, Honeywell incorporated Garrett in Delaware as a wholly owned subsidiary on March 14, 2018.  Following the effective date of the Spin-Off, Garrett received Honeywell's transportation business—a designer and manufacturer of highly engineered turbocharger, electric-boosting and connected vehicle technologies for OEMs and the automotive aftermarket for gasoline and diesel engines that enhance performance, fuel economy and drivability.  Among other things, the public was told that the Company had leading products covering a wide range of applications, including passenger cars, commercial vehicles, medium and heavy-duty trucks, and mining equipment.   Garrett has also developed electric-boosting technologies targeted for use in electrified powertrains – primarily hybrid and fuel cell vehicles – and it also engineers and provides technologies, products and services that support the growing

connected vehicle market focused on automotive cybersecurity and integrated vehicle health management.

72.     In addition to its OEM business, Garrett sells components and technologies in the global aftermarket through a distribution network of more than 190 distributors covering 160 countries.  Through this network, Garrett provides approximately 5,300 part-numbers and products to service garages across the globe.  Garrett's comprehensive portfolio of turbocharger, electric boosting and connected vehicle technologies is supported by five research and development centers, 14 close-to-customer engineering facilities and 13 factories, which are strategically located around the world.  The Company employs 6,750 employees, primarily in Romania, China, Korea, Slovakia, Mexico, Ireland, Switzerland, Japan, the United Kingdom, and the United States.

73.     Notably, Garrett's products and services are highly engineered for each individual platform, requiring close collaboration with customers in the earliest years of powertrain and new vehicle design.  Accordingly, it is critical that Garrett maintain its relationships with OEMs and other partners and that these partners trust the Company's ability to sustain its business and continue to innovate.

### E.     Defendants Knew From Inception that the Structure of the Spin-Off Made it Virtually Impossible for Garrett to Succeed as an Independent Company

74.     By at least the effective date of the Spin-Off, Defendants knew or were reckless in not knowing the above-described debt structure and liabilities made it nearly impossible for the post-spin Garrett to effectively operate and compete as an independent company.  Garrett now admits these known issues crippled the Company throughout its brief two-year history, and continue to plague Garrett today.

75.     *First*, according to Garrett's own bankruptcy filings, Garrett's business model and industry position requires constant investment in new technology, both to improve the Company's

existing products and to develop new products to meet customer demands. A failure to invest in technology for any sustained period of time will result in a loss of customers, market share and margin. Indeed, Garrett's Class Period public filings touted the extent of its research and development ("R&D") infrastructure and spending. However, Garrett now admits that because its balance sheet has been heavily burdened by debt and the indemnity liability since the Spin-Off, Garrett's ability to make investments in technology to preserve its business for the future has been severely constrained dramatically limited its ability to fund R&D to the point of making the company non-competitive.

76.     *Second*, Defendants knew that Garrett's precarious balance sheet created by the Spin-Off would make it difficult for Garrett to maintain its business and financial relationships with OEMs and suppliers. Garrett has maintained in the bankruptcy that the nature of Garrett's business is that it sells its products sometimes years in advance of the production of vehicles creating critical long-term commitments to both OEMs and Garrett's own suppliers.

77.     Defendants knew since the time of the Spin-Off that because the Company was substantially overleveraged compared to all of its primary competitors (even before considering the effects of the Indemnity Agreement), OEMs and suppliers would have significant concerns about its viability, as well as its growing technological disadvantage due to the Company's inability to spend on R&D. Defendants' knew the increasing erosion of Garrett's partnerships would undermine the Company's viability.

78.     *Third*, Defendants also knew technological changes and unprecedented disruptions, such as a shift towards electric vehicles, and increased competition from new market entrants, created uncertainty in the automotive industry would be nearly impossible to navigate given

Garrett's debt and indemnity obligations. This uncertainty was certain to be exacerbated by automotive industry consolidation.

79.     Defendants knew since the time of the Spin-Off that Garrett would be unable to compete in the shifting automotive industry. The Company's ability to negotiate a merger or sale would undoubtedly be undermined by its 30-year indemnity obligations, that purportedly survive all corporate transactions. Indeed, Garrett has since described these obligations as a "poison pill" in the hands of Honeywell that can prevent Garrett from entering into future business combinations.

80.     *Fourth*, Defendants knew that because of the significant debt already on its books, Garrett would not have access to the equity capital necessary to grow and develop as an independent company. In other words, it would be extremely unlikely that any investor would contribute new equity capital behind both the Company's funded debt and its indemnity obligations.

81.     Since the time of the Spin-Off, it was clear to Defendants that because of the terms of the Spin-Off Garrett had little if any ability to innovate, maintain its partnerships and suppliers, engage in a strategic transaction or raise its own capital. Accordingly, because of these significant obstacles there was little if any chance the Company would survive long-term following the Spin-Off as an independent company. Indeed, Garrett lasted less than two years from Spin-Off before filing bankruptcy.

## F.     Despite the Known Problems Undermining Garrett, Defendants Issued False and Misleading Statements Touting Garrett's Viability in Advance of the Spin-Off Closing

82.     None of the above-described issues—all of which Garrett now admits existed from inception—were adequately disclosed to investors. Instead, Defendants issued false and

misleading statements dating back to at least August 23, 2018 – more than a month before the Spin-Off was completed and prior to the start of the Class Period.

83.    Defendants characterized the known and materialized issues as nothing more than potential rather than already materialized risks.   For example, the registration statement corresponding to the Spin-Off, signed by Defendant Lu and filed on Form 10 on August 23, 2018 (and amended on September 5, 2018), contained false and misleading statements that mischaracterized the above known and already materialized risks:

> This agreement **may** have material adverse effects on our liquidity and cash flows and on our results of operations, regardless of whether we experience a decline in net sales. The agreement **may** also require us to accrue significant long-term liabilities on our combined balance sheet, the amounts of which will be dependent on factors outside of our control, including Honeywell's responsibility to manage and determine the outcomes of claims underlying the liabilities. As of December 31, 2017, we have accrued $1,703 million of liability in connection with Bendix related asbestos, representing the estimated liability for pending claims as well as future claims expected to be asserted. The liabilities related to the Indemnification and Reimbursement Agreement **may have** a significant negative impact on the calculation of key financial ratios and other metrics that are important to investors, rating agencies and securities analysts in evaluating our creditworthiness and the value of our securities. Accordingly, our access to capital to fund our operations **may be** materially adversely affected and the value of your investment in our company **may** decline.

84.    The so-called risk factors were wholly inadequate where, as here, the risks had already manifested and Defendant Lu either knew it, or was reckless in not knowing that among other things these debt and indemnification obligation made it virtually impossible for Garrett to survive long-term following the Spin-Off.

85.    On September 6, 2018, prior to the Spin-Off, Garrett hosted an investor conference in New York City.   Garrett's new management team, consisting of CEO Rabiller, CTO Balis, SVP

Integrated Supply Chain Mabru and CFO Gili presented at the conference.  Among other things, at the presentation Rabiller touted Garrett's "technology leadership" and "long history of innovation."  Likewise, Craig Balis gave a detailed presentation concerning Garrett's "technology leadership and broad portfolio products with breakthrough capabilities."

86.    During Defendant Mabru's portion of the presentation, he discussed R&D, highlighting that Garrett has "ample research underway to support long-term product development" and a "stable outlook" for R&D as a percentage of revenue.  While the September presentation did discuss Garrett's indemnification liabilities and the mechanics of the payments, the presentation did *not* disclose that these obligations would almost certainly undermine Garrett's "technology leadership" and limit its ability to continue spending on R&D.

87.    Put another way, in advance of the Spin-Off, through documents filed with the SEC and other public statements Defendants Lu, Rabiller, Balis, Mabru or Gili each highlighted Garrett's technology advantages and growth potential all while knowing that Garrett's heavy debt load and indemnity obligations precluded the Company's ability to succeed as an independent company.

### G.     Defendants Continued to Issue False and Misleading Statements Following the Spin-Off

88.     The Class Period begins on October 1, 2018, when the Spin-Off closed and Garrett's stock began trading on the NYSE using the ticker "GTX".  Garrett filed a Form 8-K on the date of the Spin-Off, which, among other things, announced the members of Garrett's board of directors.  The Garrett board now consisted of seven directors:  Defendants Oliver Rabiller, Carlos Cardoso, Maura Clark, Courtney Enghauser, Susan Main, Carsten Reinhard and Scott Tozier.  The Form 8-K also disclosed that Defendant Lu resigned as a director of the Company and ceased to serve as President of the Company as of September 30, 2018.  Remarkably, Defendant Lu only served as President and a director for as much time as it took for Honeywell to paper over the sham Spin-Off.

89.     Immediately following the Spin-Off and throughout the Class Period, Garrett and its executives repeatedly touted the Company's technology and R&D as the Company's strength, while failing each time to disclose the debt and indemnity obligations were preventing adequate future investment in maintaining that putative advantage.  For example, in a separate press release issued on the date the Spin-Off was completed, Defendant Rabiller stated that Garrett is "an automotive technology pioneer, inventor and innovator" and has "established a strong position for providing differentiated technologies that are in demand."

90.     Likewise, in a November 6, 2018 press release announcing Garrett's Third Quarter 2018 Results, the Company stated: "Garrett Motion Inc. (NYSE: GTX), a cutting-edge technology provider . . . .".  Defendant Rabiller is also quoted in the press release stating that he is "pleased that Garrett successfully raised the financing at favorable rates, to become a strong independent company and we look forward to continued advancement in our growth vectors in software and electrification . . . ."  These statements by Defendant Rabiller were materially false and misleading

because they implied Garrett would continue to be able to have cutting-edge technology and raise financing at favorable rates, when in fact Defendant Rabiller knew Garrett's debt and indemnity obligations would foreclose both of those possibilities.

91.      Defendants Rabiller and Gili held an earnings call with investors and analysts on November 7, 2018 to discuss its third quarter earnings.  A theme of the call was Garrett's purported technology-focused growth strategy.   For example, Defendant Rabiller's opening remarks discussed Garrett's "three stage technology growth strategy" and Garrett's presentation accompanying the call listed "sustainable margin profile driven by technology" as one of its "Key Q3 and 9M 2018 Takeaways."   During the question and answer session, Defendant Rabiller elaborated on the importance of R&D to Garrett, stating "R&D is a mix and extremely important part of our strategy.  We are a technology company.  We are investing differentiated technologies. We have a number of launches, but more than launches we are funding very well our growth vectors that will drive the company not only for the next 5 years but the next 10 to 15 years." These statements are directly contradicted by Defendants' bankruptcy-related admissions that the overhang from the Indemnity Agreement and Debt prevented these objections from the inception of the Spin-Off.

92.      Also on November 7, 2018, Garrett filed its Third Quarter Form 10-Q with the SEC, which was signed by Defendants Rabiller and Gili.  The Form 10-Q incorporated by reference the risk factors from Garrett's Form 10.  In addition, the Form10-Q stated:

> Our ability to fund our operating needs will depend on our future ability to continue to generate positive cash flow from operations and raise cash in the capital markets. Based upon our history of generating strong cash flows, we believe will be able to meet our short-term liquidity needs for at least the next twelve months. ***We believe we will meet known or reasonably likely future cash requirements, through the combination of cash flows from operating activities, available cash balances and available***

*borrowings through our debt agreements.* We expect that our primary cash requirements in 2018 will primarily be to fund capital expenditures and to meet our obligation under the debt instruments and the Indemnification and Reimbursement Agreement described below, as well as the Tax Matters Agreement. If these sources of liquidity need to be augmented, *additional cash requirements would likely be financed through the issuance of debt or equity securities*; however, there can be no assurances that we will be able to obtain additional debt or equity financing on acceptable terms in the future.

93.     The statements in Garrett's Third Quarter Form 10-Q were misleading because by this time Defendants Rabiller and Gili – along with Garrett's other officers and directors – affirmatively knew that Garrett's enormous debt and indemnity obligations undermined the Company's ability to meet its cash requirements and would preclude Garrett from being able to raise additional capital through the issuance of debt or equity securities.

94.     Garrett announced its fourth quarter and full year 2018 financial results in a press release dated February 20, 2019, which again stated that Garrett is a "cutting edge technology provider."  Moreover, in the press release, Defendant Rabiller is quoted as stating "[w]e remain well positioned for future growth as we continue to benefit from our global scale and develop the next generation of technology focused on electrification and software. By working closely with our customers, we can accelerate our differentiated technology solutions to the market and help solve their challenges by redefining and advancing motion."

95.     On the same day, Defendants Rabiller and Gili held a call to discuss the earnings with analysts and investors.  During the call, Defendant Rabiller stated Garrett's "cost structure [] enables us to improve our operational performance."  The investor presentation accompanying the call again touted Garrett's "technology growth strategy" and illustrated a steadily increasing R&D budget.

96.     Despite admittedly having little to no funds available to expend on R&D, Garrett and its directors and officers continued to issue statements in 2019 regarding Garrett's purported technological advantage.  On March 1, 2019, Garrett filed its annual report on Form 10-K for the period ended December 31, 2018, affirming the previously reported financial results.  The 10-K included purported risk factors, such as that Garret's "future growth is largely dependent on [its] ability to develop new technologies and introduce new products with acceptable margins that achieve market acceptance or correctly anticipate regulatory changes."  But these were risks the Company now admits had already materialized.  Nowhere did the Form 10-K disclose that because of Garrett's debt and indemnity obligations the Company and its executives knew the business would not be able to innovate and survive.  Likewise, the Form 10-K warned that "we may not be able to obtain additional capital" but again this was a risk Defendants admit had already materialized.  Simply put, the Form 10-K signed by Defendants Rabiller, Gili, James, Cardoso, Clark, Enghauser, Main, Reinhardt and Tozier failed to disclose that Garrett was already aware that its current debt and indemnity obligations all but foreclosed any chance it had at raising additional capital.

97.     On May 7, 2019, Garrett announced its first quarter 2019 financial results in a press release, again describing itself as a "cutting-edge technology provider."  Garrett's first quarter earnings presentation continued to tout its "Technology Growth Strategy," including in a slide Defendant Rabiller described as reflecting that "Garrett is a technology company, operating into the automotive industry and our technology growth strategy depicted here remains a key priority for the long-term success of our company."

98.     On July 30, 2019 the Company announced its second quarter 2019 financial results in a press release and investor presentation, again describing itself as a "cutting-edge technology

provider" and touting its "Technology Growth Strategy."  During Garrett's earnings call on the same day, Rabiller stated that "Garrett is a leading technology company operating in the automotive industry" and emphasized its "technology led growth strategy [] remains a key priority for long-term success."  Notably, Garrett's Form 10-Q for the second quarter filed the same day again repeated the long-since stale risk factors from its 2018 Form 10-K—all without disclosing that the putative 'risks" had long since materialized and were known or should have been known to the Defendants. [1]

99.     On November 8, 2019 the Company announced its third quarter 2019 financial results through a press release, continuing to describe Garrett as "a cutting-edge technology provider."  Defendants Rabiller and Bracke both participated on the earnings call announcing the Company's second quarter results and both signed the Third Quarter Form 10-Q that incorporated by reference the risk factors from Garrett's 2018 Form 10-K.

## H.     Defendants Secretly Hire Financial Advisors That Concluded Bankruptcy Was Likely

100.     Unbeknownst to investors, Garrett hired Morgan Stanley and Perella Weinberg Partners ("Perella") to explore strategic alternatives during the fourth quarter of 2019.  At the direction of Garrett's Board of Directors, representatives of Morgan Stanley and Perella conducted preliminary market test conversations on a "no-names basis" with approximately 15 parties regarding a potential merger with, or acquisition of, Garrett.  According to Garrett's bankruptcy filings, no potential strategic buyers expressed interest in exploring a potential transaction, but multiple financial sponsors expressed interest if and only if the potential transaction structures

---

[1] On September 2, 2019, Garrett and Defendant Gili entered into a separation agreement.  Three days later, on September 5, 2019, Garrett's Board of Directors appointed Peter Bracke, the Company's Vice President, FP&A and Business Finance, as the Company's Interim Chief Financial Officer.

included leaving behind the excessive debt and indemnity liabilities on Garrett's balance sheet (*i.e.* a sale through the bankruptcy court or successfully voiding the indemnification obligations through litigation).  Defendants now acknowledge that these conclusions simply confirmed what they had known since the Spin-Off—that the Indemnity and Debt obligations made Garrett unsustainable as a stand-alone entity.

101.    Despite knowing the Company could not survive under the heavy debt and indemnity obligations and seeking out financial and legal advice on how to proceed, the Defendants continued to issue false and misleading statements regarding aspects of the Company it affirmatively knew were unsustainable.  For example, on February 27, 2020, Garrett announced its fourth quarter and full year 2019 financial results in a press release.  The same day, Garrett filed its annual report on Form 10-K with the SEC for the period ended December 31, 2019.   The 2019 Form 10-K was signed by Defendants Rabiller, Bracke, James, Cardoso, Clark, Enghauser, Main, Reinhardt and Tozier.   Among other things, the press release stated that "*[w]ith significant financial flexibility* combined with the industry's broadest portfolio for LV, commercial vehicle, hybrid, and fuel cell products, *we are well positioned to build upon the progress we achieved during our first full year as an independent company*."  These statements were knowingly false when made—something Defendants now admit.  They also conflicted with positions taken by Garrett in a lawsuit filed by Garrett in the Supreme Court of the State of New York against Honeywell made public on January 15, 2020, in which  Garrett asserted claims against Honeywell for declaratory judgment, breach of contract, breach of fiduciary duties, aiding and abetting breach of fiduciary duties, corporate waste, breach of the implied covenant of good faith and fair dealing and unjust enrichment all related to the Indemnity and Debt obligations.

102.     Garrett's investor presentation during an earnings call on February 27, 2020 was similar misleading.   During the call, Defendants Rabiller and Bracke again discussed the "Technology Growth Strategy" repeatedly highlighted in the Company's investor presentations. Defendant Rabiller also discussed in his opening remarks how Garrett "maintained [its] strong financial position" and "stayed true to [its] approach in utilizing [its] solid cash flow to deleverage [its] balance sheet."  Rabiller later stated that Garrett has a "flexible and resilient business model" that provides "significant flexibility to help mitigate the impact from any short-term fluctuations in the underlying macro environment[.]" At no time did Defendants disclose the known and already manifested risks had long since made the touted strategies wholly unachievable.

103.     Garrett issued a Form 8-K on March 26, 2026 announcing that its Board of Directors increased the size of the Garrett board from seven to eight directors and elected Jerome Stoll as the eighth director, effective immediately.

104.     On April 7, 2020, Garrett issued a press release containing certain preliminary first quarter 2020 results, withdrawing the Company's financial guidance for the year ending December 21, 2020 and announcing a business update related to the COVID-19 pandemic.  In the press release, Defendant Rabiller is quoted stating "While our focus has been on safeguarding the health and safety of our employees and supporting our customers and local communities, we are also taking decisive and prudent steps with various stakeholders to ***enhance our liquidity and preserve the long-term health of the business***. Our senior leadership team has navigated downturns in the past and we expect to rely upon our extensive experience and resilient business model to emerge from this crisis as a stronger company."  Nothing was said about the now admitted and long-known problems created by the Indemnity and Debt obligations.

105.    The Company announced its first quarter 2020 financial results in a press release dated May 11, 2020.  In the press release, Garrett is again described as a "cutting-edge technology provider."  Despite disclosing for the first time in its Form 10-Q that there is a substantial doubt concerning Garrett's ability to continue as a going concern, Defendant Rabiller is nevertheless quoted in the press release as stating:

> "Our financial results for the first quarter ***demonstrate Garrett's flexible operating platform*** and global capabilities amid the novel coronavirus outbreak," said Olivier Rabiller, Garrett President and CEO. "Both of our production facilities in China have restarted operations and returned rapidly to full capacity after closing for a portion of the quarter due to the COVID-19 pandemic. We remain focused on taking aggressive measures in response to this unprecedented crisis with a priority on protecting the health and well-being of our employees and meeting our customer commitments. Last month, we fully drew down on our revolving credit facility to increase our financial flexibility and started the current quarter with $658 million in total liquidity. We are also temporarily reducing pay for Garrett's senior leadership team by 20% and postponing future capital expenditures without impacting near-term programs. ***By actively managing our cost structure and preserving capital, we expect to generate significant cash savings for the year, and we are evaluating further steps to ensure the continuity of our operations***. ***Garrett's positive business fundamentals remain intact*** and we will continue to calibrate production schedules in the near term and ***flex our cost structure to maintain our agility and strengthen our position for long-term success.***"

106.    Nothing was said in the Press Release, 10-Q or in the follow-on earnings call about the admittedly known-dramatic issues adversely impacting Garrett's ability to fund R&D, raise cash or pursue other alternative strategies.  For example, during earnings call the same day, Defendant Rabiller and Bracke discussed the Company's investor presentation listing as a "GTX Priority" that the Company will "leverage [its] flexible and resilient business model."   Rabiller also stated that Garrett will "maintain our focus on developing our new technologies" and the

Company remains "well positioned to accelerate our cutting-edge technologies to the market and drive long-term success." Rabiller and the other Defendants knew none of those things were true.

107.    On June 8, 2020, Garrett announced that Sean Deason had been appointed as the Company's Senior Vice President and Chief Financial Officer. Garrett also announced that Defendant Peter Bracke was transitioning from interim CFO to the Company's Chief Transformation Officer.

108.    Garrett announced amendments to certain of its credit agreements on June 12, 2020. Defendant Rabiller stated in the press release announcing the amendments that "[t]he modifications to our Credit Agreement significantly *enhance Garrett's financial flexibility* to weather the current pandemic-induced economic slowdown." Rabiller further stated that "Despite the near-term disruption across the automotive industry and global economy, it is important to remember that the *positive long-term fundamentals of our business remain intact*. Garrett has excelled as an industry leader for over 65 years, delivering critical cutting-edge technologies to major automakers worldwide. Going forward, automakers will likely encounter even tougher regulations and technical challenges after the crisis, and Garrett will bring them a wide range of differentiated products and solutions."

109.    On July 30, 2020, Garrett announced its second quarter 2020 financial results through a press release, Form 10-Q and investor presentation. In the press release, Garrett described itself as "a leading differentiated technology provider" and in its investor presentation touted its "Long-Term Technology Growth Strategy". Defendant Rabiller is quoted in the press release stating "Garrett's proven track record in operational excellence has helped us navigate the current pandemic-induced downturn. Although the market environment remains highly uncertain, we continue to benefit from our robust infrastructure and agile working capabilities as we execute

on our long-term strategy and lead the evolution of advanced turbocharging, electric-boosting, and software solutions for the global automotive industry."

110.    On the earnings call to discuss Garrett's second quarter earnings, Defendants Rabiller, Deason and Brock answered analyst questions.  Despite COVID-19 weighing on the business, Defendant Rabiller was "pleased to report in Q2, Garrett general $63 million adjusted EBITDA for a margin of 13.2% . . . ."  Rabiller continued that the crisis "highlights the strong fundamentals of Garrett . . . but at the same time exposes the ill-suited capital structure that the company inherited from its former parent Spinoff."  Nothing was said about the now admittedly known issues that would force the Company into bankruptcy just a few months later.

111.    As part of its second quarter earnings filings, Garrett removed the "substantial doubt" language raised in its previous 10-Q regarding the Company's ability to continue as a going concern, misleadingly portraying optimism that the Company could survive despite the admitted Indemnity and Debt obligation-related problems that had been undermining the Company since the Spin-Off.

**I.    Garrett Announces Financial Difficulties and Subsequently Files For Bankruptcy Protection**

112.    On August 26, 2020, before market open, Garrett announced for the first time that it would explore alternatives to address balance sheet concerns (despite the fact its financial advisors had confirmed months before what Defendants already knew--that any such effort outside of bankruptcy was doomed to failure because of the Indemnity and Debt related issues).  Garrett also advised for the first time what it now admits it had known since the Spin-Off,  that its "leveraged capital structure poses significant challenges to its overall strategic and financial flexibility and may impair its ability to gain or hold market share in the highly competitive automotive supply market, thereby putting Garrett at a meaningful disadvantage relative to its

peers."  The press release also stated that "Garrett's high leverage is exacerbated by significant claims asserted by Honeywell against certain Garrett subsidiaries under the disputed subordinated asbestos indemnity and tax matters agreement."

113.    Following the August 26, 2020 press release, Garrett's stock price fell by approximately 44%, from $6.90 per share to 3.84 per share at close on August 26, 2020.

114.    The truth was further disclosed on September 17, 2020, when *The Wall Street Journal* reported that Garrett was nearing a sale through bankruptcy to KPS.  On this news, the price of Garrett's common stock fell from $2.41 per share on September 17, 2020 to $2.01 per on September 18, 2020.

115.    Garrett filed for chapter 11 bankruptcy protection on Sunday, September 20, 2020, with a 'stalking horse' bid of $2.1 billion from a new company formed by KPS Capital Partners, LP ("KPS").  Garrett's bankruptcy filings admitted that Defendants had known from the outset that the Indemnity and Debt related obligations made it impossible for the Company to fund needed R&D, maintain relationships with OEMs and suppliers, raise capital or to pursue alternative strategies outside of bankruptcy—all of which made it clear from the start Garrett would not survive as an independent Company.  This admission bares the falsity of the myriad statements to the contrary made by Defendants beginning before the Spin-Off.  Following news of the bankruptcy filings, Garrett's stock price started trading under the symbol "GTXMWQ" and fell to $1.76 per share at close on September 22, 2020.

116.    While Garrett survived for less than two years following the Spin-off, the transaction was a resounding success for Honeywell.  Indeed, Cote got the premium valuation he had always wanted:  while Honeywell's historic average trailing twelve-month price-to-earnings

multiple over the preceding 20 years is approximately 16.5x, following the Spin-Off, Honeywell's price-to-earnings multiple skyrocketed to 21.5x.

117.    Also evidencing the success of the Spin-Off, the price of Honeywell's common stock steadily increased during the Class Period following the date of the Spin-Off, while Garrett's stock price plummeted until the Company filed for bankruptcy protection on September 20, 2020.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS

118.    Defendants made or caused to be made numerous misleading statements and omissions of materials facts before and during the Class Period.

### A.    Defendants' False and Misleading Statements Prior to the October 1, 2018 Spin-Off

119.    On August 23, 2018, Garrett filed with the SEC a Form 10, which was subsequently amended on September 5, 2018.  Both versions of the Form 10 were signed by Defendant Lu, Garrett's President and lone director at the time.  The registration contained numerous false and misleading statements, such as a risk factor that warned:

> *We are subject to risks associated with the Indemnification and Reimbursement Agreement, pursuant to which we will be required to make substantial cash payments to Honeywell, measured in substantial part by reference to estimates by Honeywell of certain of its liabilities.*
>
> \*       \*       \*
>
> *This agreement may have material adverse effects on our liquidity and cash flows and on our results of operations, regardless of whether we experience a decline in net sales. The agreement may also require us to accrue significant long-term liabilities on our combined balance sheet*, the amounts of which will be dependent on factors outside of our control, including Honeywell's responsibility to manage and determine the outcomes of claims underlying the liabilities. *As of December 31, 2017, we have accrued $1,703 million of liability in connection with Bendix related asbestos, representing the estimated liability for pending claims as well as future claims expected to be asserted.* The

liabilities related to the Indemnification and Reimbursement Agreement **may have** a significant negative impact on the calculation of key financial ratios and other metrics that are important to investors, rating agencies and securities analysts in evaluating our creditworthiness and the value of our securities. Accordingly, our access to capital to fund our operations may be materially adversely affected and the value of your investment in our company may decline. Moreover, the payments that we will be required to make to Honeywell pursuant to that agreement will not be deductible for U.S. federal income tax purposes.

120.    The Form 10 also disclosed that there was a material weakness in internal control over financial reporting.  Specifically, it stated: "***There is a material weakness in internal control over financial reporting related to the estimation of our liability for unasserted Bendix-related asbestos claims which has resulted in a restatement of our previously issued financial statements.***"

121.    The statements in the Form 10 regarding the debt and indemnity obligations were materially false and misleading when made.  It was misleading for Defendant Lu to sign the Form 10 discussing the impact of the debt and indemnity obligations and stating they "may have" a negative impact on the Company, when Garrett and Defendant Lu knew, or should have known, that these obligations made it nearly impossible for Garrett to be viable long-term as an independent company.  In other words, the purported risk that there may be a negative impact had already materialized.

122.    The Form 10 also contained risk factors regarding Garrett's potential conflicts with Honeywell.  Specifically, the Form 10 stated "we may have potential business conflicts of interest with Honeywell with respect to our past and ongoing relationships and that "[f]ollowing the Spin-Off, certain of our directors and employees may have actual or potential conflicts of interest because of their financial interests in Honeywell."  The Form 10 elaborated that "Because of their current of former positions with Honeywell, certain of our expected executive officers and

directors own equity interests in Honeywell.  Continuing ownership of Honeywell shares and equity awards could create, or appear to create, potential conflicts of interest in SpinCo and Honeywell face decisions that could have implications for both SpinCo and Honeywell."

123.    The statement in the Form 10 was materially false and misleading when made.   It was misleading for Defendant Lu to sign a document warning there *may* be a conflict of interest, when as the time there were significant actual known conflicts.  Indeed, Defendant Lu served as Garrett's President and sole director, while at the same time being employed by Honeywell as an associate general counsel.

124.    On September 6, 2018, Garrett hosted an investor conference in New York City. Defendants Rabiller, Balis, Mabru and Gili presented at the conference.  During the presentation Rabiller touted Garrett's "technology leadership" and "long history of innovation."  Likewise, Defendant Balis gave a detail presentation concerning Garrett's "technology leadership and broad portfolio products with breakthrough capabilities."  During Defendant Mabru's portion of the presentation, he discussed R&D, highlighting that Garrett has "ample research underway to support long-term product development" and a "stable outlook" for R&D as a percentage of revenue.

125.    The statements by Defendant Rabiller, Balis, Mabru and Gili at the September 6, 2018 investor conference were materially false and misleading when made.  It was misleading for these Defendants to discuss Garrett's technology, innovation and R&D as strengths of the Company, when at the time these Defendants knew, or should have known, that the debt and indemnity obligations imposed by Honeywell undermined Garrett's ability to continue to invest in these areas and remain competitive with its peers, a failure which would likely lead to Garrett not being able to survive as an independent company.

**B.      Defendants' 2018 Class Period False and Misleading Statements**

126.     On October 1, 2018, Garrett filed two Form 8-Ks announcing the completion of the Spin-Off.  In one of the attached press releases, Defendant Rabiller stated that Garrett is "an automotive technology pioneer, inventor and innovator" and has "established a strong position for providing differentiated technologies that are in demand."

127.     The statements by Defendant Rabiller on October 1, 2018 were materially false and misleading when made.  It was misleading for Defendant Rabiller to discuss Garrett's technology, innovation and "strong position for provided differentiated technologies" as strengths of the Company, when at the time these Defendant Rabiller knew, or should have known, that the debt and indemnity obligations imposed by Honeywell undermined Garrett's ability to continue to invest in these areas and remain competitive with its peers, a failure which would likely lead to Garrett not being able to survive as an independent company.

128.     On November 6, 2018, Garrett filed a press release announcing its Third Quarter 2018 Results.  In the press release, the Company described itself as "a cutting-edge technology provider."  Also in the press release, Defendant Rabiller is quoted, stating he is "pleased that Garrett successfully raised the financing at favorable rates, to become a strong independent company and we look forward to continued advance in our growth vectors in software and electrification . . . ."

129.     The statements attributed to Defendant Rabiller in the November 6, 2018 press release were materially false and misleading when made.  Specifically, it was misleading for Defendant Rabiller to describe Garrett as a "cutting-edge technology provider" and to discuss Garrett's ability to raise financing at favorable rates, when at the time Defendant Rabiller knew, or should have known, that the debt and indemnity obligations imposed by Honeywell undermined

Garrett's ability to continue to invest in developing technology and would prevent the Company from raising additional financing.

130.    On November 7, 2018, Defendants Rabiller and Gili held an earnings call with investors and analysts to discuss Garrett's third quarter earnings.  Defendants Rabiller and Gili repeatedly discussed Garrett's purported technology-focused growth strategy.  For example, Defendant Rabiller's opening remarks discussed Garrett's "three stage technology growth strategy" and Garrett's presentation accompanying the call listed "sustainable margin profile driven by technology" as one of its "Key Q3 and 9M 2018 Takeaways."  During the question and answer session, Defendant Rabiller elaborated on the importance of R&D to Garrett, stating "R&D is a mix and extremely important part of our strategy. We are a technology company. We are investing differentiated technologies. We have a number of launches, but more than launches we are funding very well our growth vectors that will drive the company not only for the next 5 years but the next 10 to 15 years."

131.    The statements by Defendants Rabiller and Gili on the November 7, 2018 earnings call were materially false and misleading when made.  It was misleading for Defendants Rabiller and Gili to discussed Garrett's technology growth strategy and R&D efforts, when at the time Defendants Rabiller and Gili knew, or should have known, that the debt and indemnity obligations imposed by Honeywell undermined Garrett's ability to continue to invest in these areas and remain competitive with its peers, a failure which would make it impossible for Garrett to survive as an independent company.

132.    Also on November 7, 2018, Garrett filed its Third Quarter Form 10-Q with the SEC, which was signed by Defendants Rabiller and Gili.  The Form 10-Q incorporated by reference the risk factors from Garrett's Form 10.  In addition, the Form10-Q stated:

Our ability to fund our operating needs will depend on our future ability to continue to generate positive cash flow from operations and raise cash in the capital markets. Based upon our history of generating strong cash flows, we believe will be able to meet our short-term liquidity needs for at least the next twelve months. **We believe we will meet known or reasonably likely future cash requirements, through the combination of cash flows from operating activities, available cash balances and available borrowings through our debt agreements.** We expect that our primary cash requirements in 2018 will primarily be to fund capital expenditures and to meet our obligation under the debt instruments and the Indemnification and Reimbursement Agreement described below, as well as the Tax Matters Agreement. If these sources of liquidity need to be augmented, **additional cash requirements would likely be financed through the issuance of debt or equity securities**; however, there can be no assurances that we will be able to obtain additional debt or equity financing on acceptable terms in the future.

133.    The statements in Garrett's Form 10-Q filed on November 7, 2018 were materially false and misleading when made.  It was misleading for the Form 10-Q to state Garrett was "reasonably likely" to meet its cash requirements and that Garrett would "likely" finance additional cash requirements through the issuance of debt or equity securities, when as the time Garrett and the Defendants that signed the Form 10-Q knew, or should have known, that the debt and indemnity obligations imposed by Honeywell undermined Garrett's ability to maintain sufficient liquidity and make it near impossible for Garrett to raise additional cash through issuing debt or equity.

## C.    Defendants' 2019 Class Period False and Misleading Statements

134.    On February 20, 2019, Garrett announced its fourth quarter and full year 2018 financial results in a press release.  The press release described Garrett as a "cutting edge technology provider."  Also in the press release, Defendant Rabiller is quoted, stating "[w]e remain well positioned for future growth as we continue to benefit from our global scale and develop the next generation of technology focused on electrification and software.  By working closely with

our customers, we can accelerate our differentiated technology solutions to the market and help solve their challenges by redefining and advancing motion."

135.    The statements by Defendant Rabiller in the February 20, 2019 press release were materially false and misleading when made.  It was misleading for Defendant Rabiller to discuss Garrett's development of "next generation" technology and accelerating the Company's "differentiated technology solutions," when at the time Defendant Rabiller knew, or should have known, that the debt and indemnity obligations imposed by Honeywell undermined Garrett's ability to continue to invest in technology and R&D and remain competitive with its peers, a failure which would make it impossible for Garrett to survive as an independent company.

136.    Also on February 20, 2019, Defendants Rabiller and Gili held an earnings call. During the call, Defendant Rabiller stated Garrett's "cost structure [] enables us to improve our operational performance."  The investor presentation accompanying the call again touted Garrett's "technology growth strategy" and illustrated a steadily increasing R&D budget.

137.    The statements by Defendants Rabiller and Gili during the February 20, 2019 earnings call were materially false and misleading when made.  It was misleading for Defendants Rabiller and Gili to tout the Company's "cost structure" and "technology growth strategy," when at the time Defendants Rabiller and Gili knew, or should have known, that the debt and indemnity obligations imposed by Honeywell undermined Garrett's ability to continue to invest in technology and R&D and remain competitive with its peers, a failure which would make it impossible for Garrett to survive as an independent company.

138.    On March 1, 2019, Garrett filed its annual report on Form 10-K for the period ended December 31, 2018.  The 2018 Form 10-K was signed by Defendants Rabiller, Gili, James, Cardoso, Clark, Enghauser, Main, Reinhardt and Tozier.  The 2018 Form 10-K included numerous

risk factors, such as that Garret's "future growth is largely dependent on [its] ability to develop new technologies and introduce new products with acceptable margins that achieve market acceptance or correctly anticipate regulatory changes." The Form 10-K also warned that "we may not be able to obtain additional capital".

139.    The statements by 2018 Form 10-K were materially false and misleading when made. It was misleading for the Defendants that signed the Form 10-K to sign a filing warning merely that Garrett's growth depends on its ability to develop technology and that the Company merely "may not be able to obtain additional capital," when at the time each of these Defendants knew, or should have known, that the debt and indemnity obligations imposed by Honeywell through the Spin-Off undermined Garrett's ability to continue to invest in developing technology and would prevent the Company from raising additional capital, factors which would make it impossible for Garrett to survive as an independent company.

140.    On May 7, 2019, Garrett announced its first quarter 2019 financial results in a press release. The press release again described Garrett as a "cutting-edge technology provider." Garrett also released an investor presentation, which discussed Garrett's "Technology Growth Strategy." On the related earnings call, Defendant Rabiller stated that "Garrett is a technology company, operating into the automotive industry and our technology growth strategy depicted here remains a key priority for the long-term success of our company."

141.    On July 30, 2019, Garrett filed a press release and investor presentation announcing the Company's second quarter 2019 financial results. These documents again described Garrett as a "cutting-edge technology provider" and touted the Company's "Technology Growth Strategy." During Garrett's earnings call on the same day, Rabiller stated that "Garrett is a leading technology company operating in the automotive industry" and emphasized its "technology led

growth strategy [] remains a key priority for long-term success." Also on July 30, 2019, Garrett filed its Form 10-Q for the second quarter, again incorporating by reference the risk factors from its 2018 Form 10-K. The Form 10-Q was signed by Defendants Rabiller and Gili.

142. The statements by Defendants Rabiller and Gili on July 30, 2019, including in its press release, earnings presentation, Form 10-Q and earnings call, were materially false and misleading when made. It was misleading for the Defendants Rabiller and Gili to discuss Garret's technology growth strategy, when at the time Defendants Rabiller and Gili knew, or should have known, that the debt and indemnity obligations imposed by Honeywell through the Spin-Off undermined Garrett's ability to continue to invest in developing technology, which would make it impossible for Garrett to survive as an independent company.

143. On November 8, 2019, Garrett announced its third quarter 2019 financial results through a press release. The press release continued to describe Garrett as "a cutting-edge technology provider." On the same day, Defendants Rabiller and Bracke both participated on the earnings call announcing the Company's second quarter results and both signed the Third Quarter Form 10-Q that incorporated by reference the risk factors from Garrett's 2018 Form 10-K.

144. The statements by Defendants Rabiller and Gili on November 8, 2019, including in its press release, earnings presentation, Form 10-Q and earnings call, were materially false and misleading when made. It was misleading for Defendants Rabiller and Gili to discuss Garrett's technology growth strategy, when at the time Defendants Rabiller and Gili knew, or should have known, that the debt and indemnity obligations imposed by Honeywell through the Spin-Off undermined Garrett's ability to continue to invest in developing technology and the Company would not be able to remain competitive as an independent company, which would make it impossible for Garrett to survive as an independent company.

145.    On December 2, 2019, Garrett issued a press release announcing that it filed a lawsuit in the Supreme Court of the State of New York against Honeywell concerning the Indemnification Agreement.  Among other things, Garrett alleged the Indemnification Agreement was not negotiated at arm's-length and is unenforceable.  Garrett's press release announcing the lawsuit stated that "For more than a year since the spinoff, Garrett has attempted to resolve these important governance and financial issues amicably with Honeywell.  After repeated, but unsuccessful discussion with Honeywell, Garrett believes it has no alternative but to turn to the Court for relief."  Garrett continued, stating that the decision to file suit "was a result of a comprehensive analysis undertaken by its management, informed by the input of outside advisors, and made with the approval of its Board of Directors, who believe this unacceptable agreement limits Garrett's ability to reach its full potential."

146.    The statements in Garrett's December 2, 2019 press release were materially false and misleading when made.  It was misleading for Garrett to merely state the Indemnification Agreement "limits Garrett's ability to reach its full potential," when at the time Garrett's senior executives and officers affirmatively knew that the Indemnity Agreement made it virtually impossible for the Company to survive and that as a result Garrett would likely be forced into bankruptcy.

### D.    Defendants' 2020 Class Period False and Misleading Statements

147.    On February 27, 2020, Garrett announced its fourth quarter and full year 2019 financial results in a press release.  The press release stated that "[w]ith significant financial flexibility combined with the industry's broadest portfolio for LV, commercial vehicle, hybrid, and fuel cell products, we are well positioned to build upon the progress we achieved during our first full year as an independent company."  The same day, Garrett filed its annual report on Form

10-K with the SEC for the period ended December 31, 2019.   The 2019 Form 10-K was signed by Defendants Rabiller, Bracke, James, Cardoso, Clark, Enghauser, Main, Reinhardt and Tozier.

148.    The statements in Garret's February 27, 2020 press release and Form 10-K were materially false and misleading when made.   It was misleading for Defendants to discuss the Company's "financial flexibility", when at the time each of the Defendants knew, or should have known, that the debt and indemnity obligations imposed by Honeywell through the Spin-Off undermined Garrett's ability to maintain positive cash flows, raise additional capital and continue as a viable independent company, which would make it impossible for Garrett to survive as an independent company.

149.    Also on February 27, 2020, Garrett released an investor presentation and held an earnings call.   During the call, Defendants Rabiller and Bracke again discussed the "Technology Growth Strategy" repeatedly highlighted in the Company's investor presentations.   Defendant Rabiller also discussed in his opening remarks how Garrett "maintained [its] strong financial position" and "stayed true to [its] approach in utilizing [its] solid cash flow to deleverage [its] balance sheet."   Rabiller later stated that Garrett has a "flexible and resilient business model" that provides "significant flexibility to help mitigate the impact from any short-term fluctuations in the underlying macro environment[.]"

150.    The statements by Defendants Rabiller and Gili on February 27, 2020 were materially false and misleading when made.   It was misleading for Defendants Rabiller and Gili to discuss Garrett's technology growth strategy and its "flexibility" to weather short-term fluctuations, when at the time Defendants Rabiller and Gili knew, or should have known, that the debt and indemnity obligations imposed by Honeywell through the Spin-Off undermined Garrett's ability to continue to invest in developing technology, restricted the Company's cash flows were

restricted, and prevented Garrett from raising additional capital, which would make it impossible for Garrett to survive as an independent company.

151.    On April 7, 2020, Garrett issued a press release concerning the impact of the COVID-19 pandemic.  In the press release, Defendant Rabiller is quoted, stating "[w]hile our focus has been on safeguarding the health and safety of our employees and supporting our customers and local communities, we are also taking decisive and prudent steps with various stakeholders to enhance our liquidity and preserve the long-term health of the business. Our senior leadership team has navigated downturns in the past and we expect to rely upon our extensive experience and resilient business model to emerge from this crisis as a stronger company."

152.    The statements by Defendants Rabiller on April 7, 2020 were materially false and misleading when made.  It was misleading for Defendant Rabiller to state Garrett could "emerge from the crisis," when at the time Defendant Rabiller knew, or should have known, that the debt and indemnity obligations imposed by Honeywell through the Spin-Off undermined Garrett's ability to continue to invest in developing technology and remain competitive with its peer, and prevent the Company from maintaining positive cash flows and avoid bankruptcy.

153.    On May 11, 2020, Garrett announced its first quarter 2020 financial results in a press release.  In the press release, Garrett is again described as a "cutting-edge technology provider."  Despite disclosing in its Form 10-Q that there is a substantial doubt concerning Garrett's ability to continue as a going concern, Defendant Rabiller is quoted in the press release stating:

> "Our financial results for the first quarter **demonstrate Garrett's flexible operating platform** and global capabilities amid the novel coronavirus outbreak," said Olivier Rabiller, Garrett President and CEO. "Both of our production facilities in China have restarted operations and returned rapidly to full capacity after closing for a portion of the quarter due to the COVID-19 pandemic. We remain

focused on taking aggressive measures in response to this unprecedented crisis with a priority on protecting the health and well-being of our employees and meeting our customer commitments. Last month, we fully drew down on our revolving credit facility to increase our financial flexibility and started the current quarter with $658 million in total liquidity. We are also temporarily reducing pay for Garrett's senior leadership team by 20% and postponing future capital expenditures without impacting near-term programs. ***By actively managing our cost structure and preserving capital, we expect to generate significant cash savings for the year, and we are evaluating further steps to ensure the continuity of our operations. Garrett's positive business fundamentals remain intact*** and we will continue to calibrate production schedules in the near term and ***flex our cost structure to maintain our agility and strengthen our position for long-term success.***"

154.    During an earnings call the same day, Defendants Rabiller and Bracke discussed the Company's investor presentation.   The presentation listed as a "GTX Priority" that the Company will "leverage [its] flexible and resilient business model."   Similarly, during the earnings call, Rabiller stated Garrett will "continue to take advantage of our flexible and resilient business model."  Rabiller also stated that Garrett will "maintain our focus on developing our new technologies" and the Company remains "well positioned to accelerate our cutting-edge technologies to the market and drive long-term success."

155.    The statements by Defendants Rabiller and Bracke on May 11, 2020 were materially false and misleading when made.  It was misleading for these Defendants to discuss Garrett's technology, its ability to manage its cost structure and the Company's "flexible and resilient business model," when at the time Defendants Rabiller and Bracke knew, or should have known that the debt and indemnity obligations imposed by Honeywell through the Spin-Off undermined Garrett's ability to continue to invest in developing technology and remain competitive with its peer, and prevented the Company from maintaining positive cash flows and avoiding bankruptcy.

156.    On June 12, 2020, Garrett announced amendments to certain of its credit agreements.  Defendant Rabiller stated in the press release announcing the amendments that "[t]he modifications to our Credit Agreement significantly enhance Garrett's financial flexibility to weather the current pandemic-induced economic slowdown."  Rabiller further stated that "Despite the near-term disruption across the automotive industry and global economy, it is important to remember that the positive long-term fundamentals of our business remain intact. Garrett has excelled as an industry leader for over 65 years, delivering critical cutting-edge technologies to major automakers worldwide. Going forward, automakers will likely encounter even tougher regulations and technical challenges after the crisis, and Garrett will bring them a wide range of differentiated products and solutions."

157.    The statements by Defendant Rabiller on June 12, 2020 were materially false and misleading when made.  It was misleading for Defendant Rabiller to state Garrett has "financial flexibility," when at the time Defendant Rabiller knew, or should have known, that the debt and indemnity obligations imposed by Honeywell through the Spin-Off undermined Garrett's ability to survive as an independent Company and that bankruptcy was likely.

158.    On July 30, 2020, Garrett announced its second quarter 2020 financial results through a press release, Form 10-Q and investor presentation.  The Form 10-Q was signed by Defendants Rabiller and Deason.  In the press release, Garrett described itself as "a leading differentiated technology provider" and in its investor presentation touted its "Long-Term Technology Growth Strategy."  In the press release, Defendant Rabiller is quoted, stating "Garrett's proven track record in operational excellence has helped us navigate the current pandemic-induced downturn. Although the market environment remains highly uncertain, we continue to benefit from our robust infrastructure and agile working capabilities as we execute on

our long-term strategy and lead the evolution of advanced turbocharging, electric-boosting, and software solutions for the global automotive industry."

159.   On the earnings call to discuss Garrett's second quarter earnings, Defendants Rabiller, Deason and Brock answered analyst questions.  Despite COVID-19 weighing on the business, Defendant Rabiller was "pleased to report in Q2, Garrett general $63 million adjusted EBITDA for a margin of 13.2% . . . ."  Rabiller continued that the crisis "highlights the strong fundamentals of Garrett . . . but at the same time exposes the ill-suited capital structure that the company inherited from its former parent Spinoff."

160.   As part of its second quarter earnings filings, Garrett removed the "substantial doubt" language raised in its previous 10-Q regarding the Company's ability to continue as a going concern, portraying optimism that the Company could survive despite the COVID-19 pandemic and the debt/indemnity obligations that have been undermining the Company since the Spin-Off.

161.   The statements by Defendants Rabiller and Deason on July 30, 2020 were materially false and misleading when made.  It was misleading for these Defendants to discuss the Company's technology growth strategy, "strong fundamentals," and remove its "substantial doubt" language, when at the time Defendants  Rabiller and Deason knew, or should have known, that the debt and indemnity obligations imposed by Honeywell through the Spin-Off undermined Garrett's ability to survive as an independent Company and that Garrett would be forced to seek bankruptcy protection.

## VI.   DEFENDANTS ACTED WITH SCIENTER WHEN THEY MADE OR CAUSED TO BE MADE MATERIAL MISSTATEMENTS OR OMISSIONS IN VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT

162.   Defendants were active and culpable participants in the fraud alleged herein, as evidenced by their knowing or reckless issuance and/or ultimate authority over the materially false or misleading statements alleged herein.  Each of the Defendants acted with scienter in that each

knew or recklessly disregarded that each of his respective public statements alleged above was materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of each such statement as a primary violator of Section 10(b) of the Exchange Act.

163.    Among other things, it was widespread knowledge within Garrett's senior ranks and board of directors that the debt obligations and Indemnity Agreement undermined Garrett's ability to maintain its technology advantage, maintain its relationships with OEMs and suppliers, retain sufficient liquidity and raise additional capital.  Accordingly, each of the Defendants knew or were reckless in no knowing these factors made it virtually impossible for Garrett to survive as an independent company.

164.    It was also well known among Honeywell's executives that the enormous debt and indemnity obligations forced upon Garrett would make it extremely difficult for the Company to be viable long-term.  Defendants Lu, Rabiller, Bracke, Balis and Mabru each held senior positions at Honeywell prior to their roles at Garrett and through those roles had knowledge of the facts alleged herein including that Garrett would be unable to remain competitive as an independent company.

165.    Finally, Garrett's bankruptcy filings admit the Defendants were well aware that the debt and indemnity obligations undermined the Company since the time of the Spin-Off.  As detailed in the Declaration of Defendant Sean Deason In Support of the Debtors' Chapter 11 Petition and First Day Pleadings (ECF No. 15 in the Bankruptcy Proceedings), since the time of the Spin-Off Defendants knew:

- Because Garrett's balance sheet was heavily burdened by debt and the indemnity liability since the Spin-Off, Garrett's ability to make investments in technology to preserve its business for the future would be severely constrained;

- As a result of Garrett's balance sheet and high leverage, Garrett has no access to incremental debt to fund R&D or capital expenditures;

- Garrett's precarious balance sheet created by the Spin-Off made it for Garrett to maintain its business and financial relationships with OEMs and suppliers because it was substantially overleveraged compared to all of its primary competitors;

- The Company's ability to participate in the rapidly shifting and consolidating automotive industry would effectively be precluded by its capital structure; and

- Garrett would not have access to the equity capital necessary to grow as an independent company and that no lender or investor would contribute new equity capital behind both the Company's funded debt and its indemnity obligations.

## VII.   LOSS CAUSATION

166.   Defendants' wrongful conduct as alleged herein directly and proximately caused Plaintiffs and the Class to suffer substantial losses.

167.   As the risks concealed by Defendants' misrepresentations and material omissions materialized in news Garrett was nearing and ultimately did file for bankruptcy protection, and facts concealed by Defendants' misrepresentations and omissions were revealed to the market by a series of partial corrective disclosures, the price of Garrett's common stock and securities declined, removing the artificial inflation.

168.   As a result of purchasing Garrett's common stock and related securities during the Class Period, Plaintiffs and the Class were damaged when the price of Garrett's common stock declined when the truth was revealed through a series of partial corrective disclosures and/or the undisclosed risks regarding Garrett's viability materialized.  The price of Garrett's common stock and related securities significantly declined when Defendants' misrepresentations and/or omissions and/or the materialization of undisclosed risks were revealed.

169.    On August 26, 2020, before market open, Garrett announced it would explore alternatives to address balance sheet concerns.  Garrett also stated that its "leveraged capital structure poses significant challenges to its overall strategic and financial flexibility and may impair its ability to gain or hold market share in the highly competitive automotive supply market, thereby putting Garrett at a meaningful disadvantage relative to its peers."  The press release also stated that "Garrett's high leverage is exacerbated by significant claims asserted by Honeywell against certain Garrett subsidiaries under the disputed subordinated asbestos indemnity and tax matters agreement."  Following the August 26, 2020 press release, Garrett's stock price fell by approximately 44%, from $6.90 per share to $3.84 per share at close on August 26, 2020.  On the same day, the price of the S&P 500 index rose $0.1%.

170.    The truth was further disclosed on September 17, 2020, when *The Wall Street Journal* reported that Garrett was nearing a sale through bankruptcy to KPS.  Among other things, the article revealed that Garrett's bankruptcy filing was imminent.  On this news, the price of Garrett's common stock fell from $2.41 per share on September 17, 2020 to $2.01 per on September 18, 2020.  On the same day, the price of the S&P 500 index fell only 0.1%.

171.    The full truth was revealed on September 20, 2020 when Garrett filed for chapter 11 bankruptcy protection.  According to its filings, after a robust bidding process, the Company selected a winning bid of $2.1 billion from a new company formed by KPS Capital Partners, LP as a stalking horse bid.  Following this news, Garrett's stock price started trading under the symbol "GTXMWQ" and fell from $2.01 per share on Friday, September 18, 2020 to $1.76 per share at close on September 22, 2020.  During the same two-day period, the S&P 500 was flat, falling just 0.01%.

## VIII.   PRESUMPTION OF RELIANCE

172.   At all relevant times, the market for Garrett's common stock was efficient for the following reasons, among others:

>   (a)  Garrett common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;
>
>   (b) As a regulated issuer, Garrett filed periodic reports with the SEC;
>
>   (c) Garrett regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and
>
>   (d) Garrett was followed by numerous securities analysts employed by major brokerage firms, such as Bank of America and RBC, who wrote reports which were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public marketplace.

173.   As a result of the foregoing, the market for Garrett's common stock promptly digested current information regarding Garrett from all publicly available sources and reflected such information in the price of Garrett's common stock.  All purchasers of Garrett common stock during the Class Period suffered similar injury through their purchase of Garrett common stock at artificially inflated prices, and a presumption of reliance applies.

174.   A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

175.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this complaint.  The specific statements alleged herein to be false and misleading were not identified as "forward looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

176.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by the Defendant who knew that those statements were false when made.

177.    Lastly, at the time the statements were made any risks warned of had already materialized and were well known to the Defendants at the time the false statements and omissions were made.

## X.    CLASS ACTION ALLEGATIONS

178.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf individuals or entities, excluding Defendants, that purchased or otherwise acquired Garrett securities during the period October 1, 2018 through September 18, 2020, inclusive and were damaged thereby.

179.    There are questions of law and fact that are common to the Class, which predominate over any individual issues, including:

(a)     whether Defendants misrepresented material facts;

(b)     whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(c)     whether the price of Garrett's common stock and related securities were artificially inflated;

(d)     whether Defendants are liable as "controlling persons" under §20(a) of the Exchange Act; and

(e)     whether Plaintiffs and the other members of the Class were injured as a result of Defendants' misconduct.

180.   Plaintiffs' claims are typical of the claims of the other members of the Class because Plaintiffs and the Class sustained damaged from Defendants' wrongful conduct.

181.   Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.  Plaintiffs have the same interests as the other members of the Class.  Accordingly, Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

182.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XI.     CLAIMS FOR RELIEF

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

183.   Plaintiffs repeat, incorporate and reallege each and every allegation contained above as if fully set forth herein.

184.   During the Class Period, Defendants Su Ping Lu, Olivier Rabiller, Alessandro Gili, Peter Bracke, Sean Deason, Craig Balis, Thierry Mabru, Russell James, Carlos Cardoso, Maura Clark, Courtney Enghauser, Susan Main, Carsten Reinhardt and Scott Tozier carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did:  (i)

deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Garrett common stock at artificially inflated prices.

185.   These Defendants:  (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Garrett's common stock in violation of Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

186.   These Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operation and prospects.

187.   During the Class Period, these Defendants made the false and misleading statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

188.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Garrett's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

189.     As described above, Defendants acted with scienter in committing the wrongful acts and omissions alleged herein in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were available to them.

190.     Defendants engaged in this scheme in order to maintain and/or inflate the prices of Garrett's common stock and related securities.

191.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Garrett's common stock and related securities.  Plaintiffs and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Garrett's common stock had been artificially inflated by Defendants' fraudulent course of conduct.

192.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Garrett securities during the Class Period.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**Against All Defendants**

193.     Plaintiffs repeat, incorporate and reallege each and every allegation set forth above as if fully set forth herein.

194.     This Count is asserted against Defendants Su Ping Lu, Olivier Rabiller, Alessandro Gili, Peter Bracke, Sean Deason, Craig Balis, Thierry Mabru, Russell James, Carlos Cardoso, Maura Clark, Courtney Enghauser, Susan Main, Carsten Reinhardt and Scott Tozier for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

195.     As alleged above, the Defendants each violated Section 10(b) and Rule 10b-5 thereunder by their acts and omissions as alleged in this Complaint.

196.     By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control the materially false and misleading public statements about Garrett during the Class Period, each of the Defendants named in this Count had the power and ability to control the actions of Garrett and its employees.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of the Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.     Awarding such equitable/injunctive or other further relief (including, but not limited to, rescission) as the Court may deem just and proper.

## XIII.  JURY DEMAND

197.     Plaintiff hereby demands a trial by jury.

DATED:  October 5, 2020                     Respectfully Submitted,
               New York, New York


                                            */s/ Andrew J. Entwistle*
                                            Andrew J. Entwistle
                                            **ENTWISTLE & CAPPUCCI LLP**
                                            Frost Bank Tower
                                            401 Congress Avenue
                                            Suite 1170
                                            Austin, TX 78701
                                            Telephone: (512) 710-5960
                                            aentwistle@entwistle-law.com

                                            Vincent R. Cappucci
                                            Joshua K. Porter
                                            Andrew M. Sher
                                            **ENTWISTLE & CAPPUCCI LLP**
                                            299 Park Avenue, 20th Floor
                                            New York, New York 10171
                                            Telephone:  (212) 894-7200
                                            vcappucci@entwistle-law.com
                                            jporter@entwistle-law.com
                                            asher@entwistle-law.com

                                            *Counsel for Plaintiffs The Gabelli Asset
                                            Fund, The Gabelli Dividend and Income
                                            Trust, The Gabelli Value 25 Fund Inc., The
                                            Gabelli Equity Trust Inc., SM Investors LP
                                            and SM Investors II LP*

## <u>CERTIFICATION</u>

I, David M. Goldman, on behalf of The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc. and The Gabelli Equity Trust Inc. (the "<u>Funds</u>"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am General Counsel of Gabelli Funds, LLC, investment manager for the Funds, and am authorized to execute this Certification on behalf of the Funds. I have reviewed the Complaint for Violations of the Federal Securities Laws and have authorized its filing.

2. The Funds did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. The Funds are willing to serve as lead plaintiffs and representative parties on behalf of the Class, including providing testimony at deposition and trial, if necessary.  The Funds fully understand the duties and responsibilities of a lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4. The Funds' transactions in Garrett Motion Inc. securities that are the subject of this action are set forth in Schedule A hereto.

5. The Funds have not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification, except certain of the Funds (The Gabelli Dividend and Income Trust, The Gabelli Asset Fund and The Gabelli Value 25 Fund Inc.) are lead plaintiffs in *In re Resideo Technologies, Inc. Securities Litigation,* Case No. 19-cv-02863 (D. Minn.).  In addition, the Funds' investment manager served as a lead plaintiff *In re Akorn, Inc. Data Integrity Sec. Litig.*, No. 18-cv-01713 (N.D. Ill.) and its affiliated entity – GAMCO Asset Management Inc. – sought to serve as lead plaintiff in *GAMCO Asset Management, Inc. v. Mark McCollum et al.*, No. 19-cv-03363 (S.D. Tex.).

6. The Funds will not accept any payment for serving as representative parties on behalf of the Class beyond their *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this October 2, 2020.

David M. Goldman
General Counsel
Gabelli Funds, LLC

**SCHEDULE A TO CERTIFICATION OF DAVID M. GOLDMAN**

**The Gabelli Asset Fund**

| TYPE | DATE | SHARES | PRICE | TOTAL |
|------|------|--------|-------|-------|
| SPIN |  | 25,600 | $17.60 | $450,560.00 |
| SELL | 10/31/2018 | 3,000 | $14.90 | $44,704.50 |
| SELL | 12/28/2018 | 2,000 | $12.41 | $24,813.80 |
| SELL | 1/2/2019 | 2,000 | $12.70 | $25,396.00 |
| BUY | 10/29/2019 | 11,400 | $10.11 | $115,219.80 |
| SELL | 1/6/2020 | 1,000 | $9.64 | $9,637.10 |
| SELL | 1/6/2020 | 1,000 | $9.55 | $9,546.00 |
| BUY | 5/27/2020 | 15,000 | $4.97 | $74,610.00 |
| BUY | 6/4/2020 | 10,000 | $5.84 | $58,428.00 |
| BUY | 6/26/2020 | 25,000 | $4.97 | $124,247.50 |
| BUY | 7/13/2020 | 10,000 | $5.08 | $50,829.00 |
| SELL | 8/27/2020 | 9,400 | $3.35 | $31,521.96 |
| SELL | 9/17/2020 | 1,600 | $2.79 | $4,471.04 |

**The Gabelli Dividend and Income Trust**

| TYPE | DATE | SHARES | PRICE | TOTAL |
|------|------|--------|-------|-------|
| SPIN |  | 32,682 | $17.60 | $575,203.20 |
| SELL | 10/15/2018 | 460 | $15.58 | $7,167.90 |
| SELL | 11/14/2018 | 1,000 | $13.45 | $13,449.70 |
| SELL | 12/12/2018 | 2,411 | $12.00 | $28,932.00 |
| SELL | 12/13/2018 | 500 | $11.90 | $5,950.45 |
| SELL | 12/18/2018 | 3,000 | $12.24 | $36,720.60 |
| SELL | 2/20/2019 | 4,500 | $17.00 | $76,500.00 |
| SELL | 8/8/2019 | 5,211 | $12.52 | $65,249.54 |
| BUY | 5/27/2020 | 5,000 | $4.97 | $24,870.00 |
| BUY | 6/3/2020 | 5,000 | $6.20 | $30,978.00 |
| BUY | 6/4/2020 | 20,000 | $5.84 | $116,856.00 |
| BUY | 6/11/2020 | 10,000 | $5.56 | $55,625.00 |
| BUY | 6/26/2020 | 20,000 | $4.97 | $99,398.00 |
| BUY | 7/13/2020 | 10,000 | $5.08 | $50,829.00 |
| BUY | 8/4/2020 | 4,400 | $5.69 | $25,024.56 |
| SELL | 9/4/2020 | 5,000 | $3.19 | $15,950.00 |
| BUY | 9/24/2020 | 5,000 | $1.62 | $8,099.00 |

**The Gabelli Equity Trust Inc.**

| TYPE | DATE | SHARES | PRICE | TOTAL |
|------|------|--------|-------|-------|
| SPIN |  | 30,300 | $17.60 | $533,280.00 |
| SELL | 10/16/2018 | 3,000 | $15.44 | $46,319.40 |
| SELL | 11/2/2018 | 1,000 | $14.85 | $14,853.10 |
| SELL | 11/20/2018 | 2,100 | $11.55 | $24,255.00 |
| BUY | 7/27/2020 | 1,800 | $6.97 | $12,546.36 |

**SCHEDULE A TO CERTIFICATION OF DAVID M. GOLDMAN**

**The Gabelli Value 25 Fund Inc.**

| TYPE | DATE | SHARES | PRICE | TOTAL |
|------|------|--------|-------|-------|
| SPIN |            | 8,400  | $17.60 | $147,840.00 |
| BUY  | 10/10/2018 | 19,000 | $15.85 | $301,150.00 |
| BUY  | 10/11/2018 | 17,000 | $15.35 | $260,950.00 |
| BUY  | 11/7/2018  | 10,000 | $13.71 | $137,071.00 |
| SELL | 12/24/2018 | 2,400  | $12.38 | $29,721.60 |
| SELL | 12/26/2018 | 2,000  | $12.26 | $24,525.40 |
| SELL | 11/14/2019 | 5,000  | $10.23 | $51,167.00 |
| SELL | 6/24/2020  | 4,000  | $5.09  | $20,361.20 |
| SELL | 8/28/2020  | 3,500  | $3.38  | $11,825.80 |
| SELL | 8/31/2020  | 3,500  | $3.00  | $10,484.95 |

## CERTIFICATION

I, Salvatore Muoio, on behalf of SM Investors LP and SM Investors II LP (the "Funds"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am Chief Executive Officer of S. Muoio & Co. LLC, investment manager for the Funds, and am authorized to execute this Certification on behalf of the Funds. I have reviewed the Complaint for Violations of the Federal Securities Laws and have authorized its filing.

2. The Funds did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. The Funds are willing to serve as lead plaintiffs and representative parties on behalf of the Class, including providing testimony at deposition and trial, if necessary. The Funds fully understand the duties and responsibilities of a lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4. The Funds' transactions in Garrett Motion Inc. securities that are the subject of this action are set forth in Schedule A hereto.

5. The Funds have not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification. However, the Funds' investment manager sought to serve as a lead plaintiff in *Sayce v. Forescout Technologies, Inc., et al.*, Case No. 3:20-cv-00076-SI (N.D. Cal 2020).

6. The Funds will not accept any payment for serving as representative parties on behalf of the Class beyond their *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this October 5, 2020.

By: Salvatore Muoio
Chief Executive Officer, S. Muoio & Co. LLC

## SCHEDULE A TO CERTIFICATION OF SALVATORE MUOIO

**SM Investors LP**

| TYPE | DATE | SHARES | PRICE | TOTAL |
|------|------|--------|-------|-------|
| SPIN | | 20,333 | $17.59 | $357,745 |
| BUY | 10/01/18 | 4,667 | $18.25 | $85,170 |
| SELL | 10/09/18 | 667 | $16.87 | $11,249 |
| BUY | 10/19/18 | 10,000 | $13.75 | $137,485 |
| SELL | 12/24/18 | 3,333 | $12.39 | $41,279 |
| SELL | 12/31/18 | 30,000 | $12.10 | $362,916 |
| BUY | 06/18/19 | 3,500 | $15.17 | $53,081 |
| BUY | 07/10/19 | 980 | $14.02 | $13,744 |
| BUY | 08/15/19 | 14,000 | $10.95 | $153,245 |
| BUY | 08/16/19 | 30,000 | $11.39 | $341,598 |
| SELL | 08/28/19 | 2,000 | $9.96 | $19,915 |
| SELL | 10/09/19 | 5,000 | $8.96 | $44,778 |
| SELL | 02/03/20 | 7,000 | $8.62 | $60,361 |
| SELL | 02/19/20 | 10,000 | $8.38 | $83,799 |
| SELL | 02/21/20 | 1,500 | $8.06 | $12,088 |
| SELL | 02/27/20 | 6,500 | $6.96 | $45,267 |
| SELL | 03/05/20 | 4,200 | $6.32 | $26,532 |
| SELL | 03/23/20 | 2,500 | $2.86 | $7,145 |
| BUY | 04/14/20 | 12,220 | $5.13 | $62,688 |
| BUY | 08/26/20 | 30,500 | $3.97 | $120,972 |
| | | | | |
| SELL SHORT | 08/11/20 | 484 | $0.55 | $26,620 |
| SELL SHORT | 08/12/20 | 126 | $0.55 | $6,930 |
| SELL SHORT | 08/26/20 | 300 | $0.35 | $10,500 |
| COVER SHORT | 09/11/20 | 152 | $1.93 | $29,334 |
| COVER SHORT | 09/14/20 | 152 | $1.97 | $29,914 |
| COVER SHORT | 09/14/20 | 152 | $1.97 | $29,914 |
| COVER SHORT | 09/14/20 | 152 | $1.97 | $29,942 |
| COVER SHORT | 09/15/20 | 152 | $1.90 | $28,880 |
| ASSIGN BUY | 09/16/20 | 24 | $0.54 | $0 |
| ASSIGN BUY | 09/16/20 | 2,400 | $5.00 | $12,000 |
| COVER SHORT | 09/17/20 | 130 | $2.65 | $34,476 |
| EXPIRE | 09/18/20 | 130 | $0.00 | $0 |

## SCHEDULE A TO CERTIFICATION OF SALVATORE MUOIO

| | | SM Investors II LP | | |
|---|---|---|---|---|
| **TYPE** | **DATE** | **SHARES** | **PRICE** | **TOTAL** |
| BUY | 09/28/18 | 40,667 | $17.59 | $715,507 |
| BUY | 10/01/18 | 9,333 | $18.25 | $170,322 |
| SELL | 10/09/18 | 1,333 | $16.87 | $22,481 |
| BUY | 10/19/18 | 20,000 | $13.75 | $274,970 |
| SELL | 12/24/18 | 6,667 | $12.39 | $82,571 |
| SELL | 12/31/18 | 60,000 | $12.10 | $725,832 |
| BUY | 06/18/19 | 3,500 | $15.17 | $53,081 |
| BUY | 07/10/19 | 1,820 | $14.02 | $25,525 |
| BUY | 08/15/19 | 26,000 | $10.95 | $284,599 |
| BUY | 08/16/19 | 30,000 | $11.39 | $341,598 |
| SELL | 08/23/19 | 15,000 | $10.69 | $160,363 |
| SELL | 08/28/19 | 2,000 | $9.96 | $19,915 |
| SELL | 10/09/19 | 5,000 | $8.96 | $44,778 |
| SELL | 02/03/20 | 13,000 | $8.62 | $112,100 |
| SELL | 02/19/20 | 20,000 | $8.38 | $167,598 |
| SELL | 02/21/20 | 500 | $8.06 | $4,029 |
| BUY | 04/14/20 | 37,780 | $5.13 | $193,809 |
| BUY | 08/26/20 | 69,500 | $3.97 | $275,658 |
| | | | | |
| SELL SHORT | 08/11/20 | 1,104 | $0.55 | $60,720 |
| SELL SHORT | 08/12/20 | 286 | $0.55 | $15,730 |
| SELL SHORT | 08/26/20 | 684 | $0.35 | $23,940 |
| COVER SHORT | 09/11/20 | 348 | $1.93 | $67,161 |
| COVER SHORT | 09/14/20 | 348 | $1.97 | $68,553 |
| COVER SHORT | 09/14/20 | 348 | $1.97 | $68,486 |
| COVER SHORT | 09/14/20 | 348 | $1.97 | $68,486 |
| COVER SHORT | 09/15/20 | 348 | $1.90 | $66,120 |
| ASSIGN BUY | 09/15/20 | 50 | $0.54 | $0 |
| ASSIGN BUY | 09/15/20 | 5,000 | $5.00 | $25,000 |
| ASSIGN BUY | 09/16/20 | 76 | $0.54 | $0 |
| ASSIGN BUY | 09/16/20 | 7,600 | $5.00 | $38,000 |
| COVER SHORT | 09/17/20 | 220 | $2.65 | $58,344 |
| EXPIRE | 09/18/20 | 220 | $0.00 | $0 |